SEALED          ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUL 1 4 2009

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| *ex rel* PORTIA ALDREDGE, | § |
| TIFFANY TURNER, MONICA LEWIS, | § |
| JAMES LEWIS, NATHAN WALLACE, | § |
| and LORI JACKSON | § |
| | § |
| *Plaintiffs,* | § |
| | § |
| VS. | § |
| | § |
| ATI ENTERPRISES, INC. d/b/a | § |
| ATI TECHNICAL TRAINING | § |
| CENTER, ATI CAREER TRAINING | § |
| CENTER, and ATI CAREER TRAINING; | § |
| ATI ENTERPRISES OF FLORIDA, | § |
| INC. d/b/a ATI CAREER TRAINING; | § |
| AND ATI ACQUISITION COMPANY, | § |
| | § |
| *Defendants.* | § |

CIVIL ACTION NO.:
**8-09CV1313-G**

(FILED UNDER SEAL)

JURY TRIAL DEMANDED

## FALSE CLAIMS ACT COMPLAINT

**TO THE HONORABLE COURT:**

COME NOW Plaintiff UNITED STATES OF AMERICA and Relators PORTIA
ALDREDGE, TIFFANY TURNER, MONICA LEWIS, JAMES LEWIS, NATHAN WALLACE,
and LORI JACKSON, who for their complaint state as follows:

## I.

## INTRODUCTION

1.     This is a civil action for damages and civil penalties brought by Plaintiffs pursuant to 31

U.S.C. §§ 3729, *et seq.* pertaining to false and/or fraudulent claims which the Defendants submitted



or caused to be submitted to the United States Government.  Defendants are recipients of funds from

the United States Department of Education, through the Higher Education Act ("HEA").

## II.

## THE PARTIES

**A.     Plaintiff**

2.     Plaintiff is the United States of America on whose behalf Relators bring this action.  The

United States of America is here named a plaintiff because funds of the United States of America

("Federal funds") were and are awarded to Defendants, pursuant to the HEA, Title IV, as a result of

the false claims as alleged in this Complaint.

**B.     Relators**

3.     Relator Portia Aldredge ("Relator Aldredge" or "Aldridge") is a resident of Dallas County,

Texas.  She was employed as a Career Services Coordinator and Director of Career Services for

Defendants from September 20, 2006 through December 18, 2008 and worked at the campuses

located at 10003 Technology Blvd., W. Dallas, TX 75220 ("Technology Blvd. Campus" or Campus

50") and 6627 Maple Ave., Dallas, TX 75235 ("Maple Ave. Campus" or "Campus 10").

4.     Relator Tiffany Turner ("Relator Turner" or "Turner") is a resident of Tarrant County, Texas.

 She was employed as an admissions representative and Assistant Director of Admissions for

Defendants from July 25, 2006 through March 26, 2009 and worked at the following locations:  2998

Stemmons Freeway, Dallas, TX 75247 ("Stemmons campus" or "Campus 57" ), 6351 Boulevard 26,

North Richland Hills, TX 76180 ("North Richland Hills campus" or "Campus 30"), Campus 50 and

Campus 10.

5.     Relator Monica Lewis ("Relator Monica Lewis" or "Monica Lewis") is a resident of Dallas

County, Texas. She was employed as an Ability to Benefit Advisor for Defendants from April 21, 2008 until March 17, 2009 and worked at Campus 50.

6.     Relator James Lewis ("Relator James Lewis" or "James Lewis") is a resident of Dallas County, Texas. He is employed as a Job Developer and Re-entry Coordinator from February 21, 2007 to present at Campus 30 and Campus 10.

7.     Relator Nathan Wallace ("Relator Wallace" or "Wallace") is a resident of Tarrant County, Texas. He is employed as a Manager of Admissions and Director of Admissions from November, 2007 to May 19, 2009 at Campus 50 and Campus 10.

8.     Relator Lori Jackson ("Relator Jackson" or "Jackson") is a resident of Kaufman County, Texas. She is employed as a Financial Aid Advisor from March 27, 2009 until June 1, 2009 and worked at the ATI corporate offices in North Richland Hills, Texas with ATI's online program ("the Program").

9.     Aldridge, Turner, Monica Lewis, James Lewis, Wallace and Jackson are referred to collectively herein as "Relators")

## C.     Defendants

10.     Defendant ATI Enterprises, Inc. d/b/a ATI Technical Training Center, ATI Career Training Center, and ATI Career Training is a Texas Corporation organized under the laws of the State of Texas, whose principal place of business is located in Tarrant County, Texas and may be served with process through its registered agent C T Corporation System, 350 North St. Paul St., Dallas, TX 75201.

11.     Defendant ATI Enterprises of Florida, Inc. d/b/a ATI Career Training is a Texas Corporation organized under the laws of the State of Texas, whose principal place of business is located in Tarrant County, Texas and may be served with process through its registered agent C T Corporation

System, 350 North St. Paul St., Dallas, TX 75201.

12.     Defendant ATI Acquisition Company is a Delaware corporation organized under the laws of the State of Delaware whose principal place of business is located in Tarrant County, Texas and may be served with process through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

13.     Defendants are referred to collectively as "Defendants" and/or "ATI."

### III.

### JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 *et seq.*  Further, this case arises from the wrongful conduct of the Defendants incident to obtaining funds from the United States Department of Education pursuant to the Higher Education Act, Title IV.

15.     This Court has *in personam* jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process.

16.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C § 3732(a) which provides that any action under this section may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by 31 U.SC. §§ 3729, *et seq.* occurred.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants can be found in, reside in, and/or transact business in this district and because some of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.  Venue is proper in the

Northern District of Texas because Defendants maintain and operate campuses within this District.

## IV.

## FACTUAL ALLEGATIONS

### A.   BACKGROUND

18.     Defendants are a private for profit institution.  ATI owns and operates various career training

schools located in Texas, Oklahoma, New Mexico and Florida.

19.     Defendants had to apply for and receive a Certificate of Authority ("CA") issued by the Texas

Workforce Commission ("TWC") in order to operate career schools in Texas.  TWC exercises

jurisdiction and control of the system of career schools and colleges and enforces minimum

standards for approval of career schools and colleges pursuant to Chapter 132 of the Texas Education

Code.

20.     ATI sought and obtained eligibility to participate in the Federal Student Aid (FSA) programs

of the United States Government as a proprietary institution of higher education.  To participate in

federal financial aid programs, Defendants had to enter into a written program participation

agreement (PPA) with the Secretary of the United States Department of Education.  The PPA

conditions the initial and continued participation of an eligible institution in any Title IV, HEA

program upon compliance with the provisions of this part, the individual program regulations, and

any additional conditions specified in the PPA that the Secretary requires the institution to meet.

United States Code Title 20, Ch. 28 § 1094, sets forth numerous criteria that must be complied with

in order to participate in the Title IV program.  These criteria include truthful job placement

statistics, relevant state licensing requirements of the state in which such institution is located for any

job the course of instruction is designed to prepare such prospective students.  The criteria in § 1094



also requires applicant schools to provide training for gainful employment in a recognized occupation and include certain requirements for instructional time. Finally, Defendants had to ensure to the U.S. Department of Education ("DOE") that its programs are approved by the relevant state agencies before it was entitled to receive any Title IV funding from the DOE

21.     By entering into a PPA, an institution agrees that it will complete, in a timely manner and to the satisfaction of the Secretary of Education, surveys conducted as part of the Integrated Postsecondary Education Data System ("IPEDS"). 34 CFR 668.14(b)(19). IPEDS is a system of interrelated surveys conducted annually by the U.S. Department's National Center for Education Statistics (NCES). IPEDS gathers information from every college, university, and technical and vocational postsecondary institution that participates in the federal student financial aid programs. The Higher Education Act of 1965, as amended, requires that institutions that participate in federal student aid programs report data on enrollments, program completions, graduation rates, faculty and staff, finances, institutional prices, and student financial aid.

22.     HEA, Title IV, also prohibits colleges and universities from providing "any commission, bonus or other incentive payment. . ." to recruiters based on recruiting activities. HEA, §487(a)(20). The statutory incentive compensation ban is a core prerequisite for an educational institution's eligibility to request and receive Title IV funds. This ban was enacted in order to prevent colleges and universities from enrolling unqualified students who will derive little benefit from the subsidy and were likely to be unable or unwilling to repay federally guaranteed loans.

23.     One of the federal regulations that ATI promised to comply with in the PPA requires that the school be licensed to operate in each state in which it is doing business. Specifically, the institution must be "legally authorized to provide an educational program beyond secondary education in the state in which the institution is physically located." 34 C.F.R. § 600.5(a)(4). If the school is not

licensed by the state in which it is doing business, it is not eligible to participate in the Title IV, HEA program.

24.     The Texas Education Code provides that advertising must not be misleading or erroneous, either by actual statement, omission, or intimation, TX. EDUC. CODE § 132.055(b)(12); *see also* TX. ADMIN. CODE § 807.171(a) (no "deceptive statements in attempting to enroll students" may be made). A school's admissions representatives shall also not engage in acts or practices that have a tendency to intimidate, coerce, or mislead a prospective student into accepting an enrollment. TX. ADMIN. CODE § 807.53(7). Admissions representatives shall not give false, misleading, or deceptive information about any aspect of the school's operation, programs, completion or employment rates, job placement, or salary potential. TX. ADMIN. CODE § 807.53(5).

25.     ATI must supply to students, *prior to enrollment*, the current rates of job placement and employment of students who have been issued a certificate of completion. TX. EDUC. CODE § 132.053(b)(5).

26.     ATI must maintain a reasonable student completion rate for each program and minimum employment rate for program graduates in jobs related to the stated occupation, as a condition of program renewal. TX. ADMIN. CODE § 807.131. The TWC requires a 60% placement rate. To demonstrate the minimum level, each school is required to report its completion, employment, and placement rates to the TWC. TX. ADMIN. CODE § 807.284(b); *see also* TX. EDUC. CODE §132.055(b)(5), (15). These reports must be certified under oath as being accurate.

27.     ATI must apply annually to register its representatives on forms provided by the TWC. TX. ADMIN. CODE § 807.051(a). Representatives are under the control of the school and are deemed to be agents of the school. TX. ADMIN. CODE §807.051(b). The school is responsible for any representations or misrepresentations expressly made or implied by its representative. TX. ADMIN.

CODE § 807.051(b).  If a student is solicited or enrolled by an unregistered representative, the student is entitled to a refund of all monies paid and a release of all obligations.  TX. ADMIN. CODE § 807.051(c).  A contract signed by a prospective student as a result of a solicitation or enrollment by an unregistered representative is null and void and unenforceable.  TX. ADMIN. CODE § 807.051(c).

28.     ATI shall require for admission into its programs proof of one of the following: secondary education, successful completion of one full-time academic semester at an accredited college or university or other postsecondary school, or (for certificate programs only) a proven ability to benefit by obtaining a satisfactory score on an entrance test.  TX. ADMIN. CODE § 807.192(a).  Among the requirements for entrance tests are the requirements that the test may not be administered by admissions representatives, nor is anyone allowed to assist the student in answering questions.  TX. ADMIN. CODE § 807.192(b)(3).

29.     If a school has admissions representatives who enroll students off-campus, the school is required to submit to the TWC a form signed under oath stating that it has such off-campus enrollment activity.  If a school does enroll students off-campus it is required to provide the enrolling student with a separate form advising the student of his or her right to rescind the enrollment agreement three (3) business days after signing.  The separate form must be in the format specified by the TWC.  TX. ADMIN. CODE § 807.194(f).

30.     In order to award FSA program funds to students, Defendants were also required to ensure that their programs were eligible, make certain that the programs were is included under the notice of accreditation from a nationally recognized accrediting agency and make certain that it is authorized by the appropriate state agency to offer the program. (34 C.F.R. Section 668.8).

**B.     ADMISSIONS VIOLATIONS**

31.     ATI maintains a high pressure sales culture that constantly pushes admissions representatives

and managers from the top down to increase enrollment through aggressive and misleading sales techniques and tactics. ATI recruiters are driven to enroll as many students as possible by constant pressure, beginning at the corporate office and reinforced at each campus. This was achieved by placing admissions representatives in constant fear of punishment, loss of income and/or termination. ATI did not place upper limits or caps on the number of enrolled students for each program start for the various training programs offered. The enrollment of prospective students was driven, not by the needs and wants of the student, but by the pressure to enroll as many students in the next program start at each campus.

32.     Admissions directors and managers are expected to motivate through intimidation and threats. Even high performing admissions representatives who exceed their sales quotas are made to feel that their position is not secure and that further improvement is required. The Company also routinely uses Performance Improvement Plans ("PIP") to pressure managers and representatives to improve their enrollment numbers. These PIPs were used when a representative or manager did not exceed enrollment quotas. These "poorly performing" representatives were advised that their failure to improve their enrollment numbers would ultimately result in termination. Corporate level managers utilized sales meetings and conference calls in which managers and directors were singled out and threatened for not exceeding their enrollment numbers.

## C.     RECRUITER MISREPRESENTATIONS AND MISCONDUCT

33.     In order to meet the ever increasing expectations of management, admissions representatives utilize many different forms of manipulation and misrepresentation to secure a signed enrollment contract from prospective students. These practices occur in some form or variation at each ATI campus. ATI admissions representatives utilize a combination of false promises and emotional manipulation to make a prospective enrollee feel compelled to sign the enrollment contract.

Admissions representatives were told: "If you are a good rep, you know how to make people do what you tell them to do."

34.     Because ATI is a career training school, most of the misrepresentations revolve around the guarantee of a high paying job. ATI creates and distributes statistical summaries of the performance of each admissions representative and the collective performance of the admissions departments at each campus. In order to achieve the quotas and other sales performance standards set by ATI, admissions representatives were under constant pressure to do what was necessary to obtain a signed enrollment contract from each prospective student they encountered.

35.     In many instances, sales representatives first encounter a prospective student over the phone. They then attempt to persuade the prospect to come to the school where they can meet in person. During these encounters, many representatives make promises and representations about the school's programs, student outcomes, job prospects and placement success that are not true. Admissions personnel routinely tell prospective students that ATI has an 85% placement rate. This number has been repeatedly quoted by management and corporate officers, including Rey Torres (Executive Director at Campus 30), Carolyn Galleger (Vice President) and Carli Strength (Chief Operations Officer). Other admissions representatives simply promised job placement, rather than quote a statistic.

36.     Some admissions representatives travel to homeless shelters to find potential students. These individuals are particularly vulnerable to promises of high paying jobs upon graduation. Many of these homeless, prospective students are also promised money, gas cards and transportation assistance to induce them to enroll. They are promised employment and given unrealistic expectations of future income and employment.

37.     A large number of the prospective students at Campus 10 had criminal records. Many representatives recruit these potential students by working with parole and probation officers. A great

number of these individuals were previously convicted of felonies. Admissions representatives are instructed not to inquire about or discuss a prospective student's criminal record during telephone calls or in person interviews. If an admissions representative is asked by a prospective student whether their criminal record would impact their ability to obtain a job after completion of the ATI program, the representatives are generally instructed to tell the recruit that the recruit's criminal record will not be a problem. Prospective students with felony convictions were enrolled in the HVAC program, despite the fact that due to their criminal record, many of these students will not be eligible for licensure in the HVAC field.

38.     At Campus 50, most of the programs are in allied health fields such as medical and dental assisting, massage therapy, and respiratory therapy. Most employers in these fields require a criminal background check.   Some positions like massage therapy and respiratory therapy require state certification. Despite the known restrictions and limitations on placement for persons with criminal records in these fields, admissions representatives routinely misinformed and enrolled students with drug convictions, prostitution convictions, child endangerment charges, violent crimes and felonies. Furthermore, this was done with the knowledge and approval of the executive director of the school.

39.     At Campus 10, the admissions department held a special "orientation seminar" to sell a large group of probationers with criminal records on ATI.  The event was attended by 60 to 80 or more individuals and the school set a record by enrolling more students in a single week than ever before. These individuals were specifically told that their criminal records would not prevent them from obtaining good paying jobs upon completion of the program.

40.     When selling any training program at the ATI campuses the focus was on convincing the prospective student that they were guaranteed to obtain a high paying job in their field if they enrolled. Admissions representatives would routinely give made-up salary and hourly rate figures that greatly

exaggerated the income an ATI graduate could expect to receive.  Examples include: Respiratory

therapists making $60,000 to $70,000 thousand dollars a year, medical assistants making $17.00 to

$18.00 an hour, dental assistants making $22.00 an hour, automotive technicians earning $17.00 to

$18.00 an hour, and welders being able to earn over $100,000 a year.  Admissions representatives knew

from the experiences of their previous graduates that these numbers were unrealistic and not consistent

with the outcome of the average ATI graduate.  ATI representatives also led prospective students to

believe that ATI was well respected among employers and that we had special relationships with

employers that would further ensure placement.    ATI representatives made numerous

misrepresentations about the quality of the programs, the qualifications and experience of the

instructors, the quality of the facilities and training equipment, the size of classes, the content of classes

and the degree of hands on training and individual instruction given in the program labs.

41.     Due to the constant focus on increased enrollment, there were no maximum enrollment

limitations on any program start.  As a result, program starts were routinely over sold to the point that

the number of students in classes exceeded the capacity of the class room seating.  As a result of over-

enrollment, the various programs were constantly experiencing problems hiring and retaining enough

qualified instructors.  Severe space problems led to the conversion of break rooms and other non-

classroom spaces to attempt to accommodate the excessive enrollment.

42.     Admissions representatives were trained to place as many students as possible in the next

program start, regardless of what program a potential student stated that they wanted to be placed in.

The point of selling an upcoming start was to enroll as many students as possible before classes for the

start began.  It was a common admissions practice to "flip" a potential enrollee from the program they

wanted, to a program that was near a start date.  For example, if a potential student said she wanted to

be in the massage therapy program, but admissions was trying to sell an upcoming dental assistant

program start, they would use any means they could to convince the prospect that she was better suited

to be a dental assistant. Admissions representatives might tell the prospective student that she was

better suited for the dental program because she had beautiful teeth. If an admissions representative

was trying to flip someone to a massage therapy program start they might tell the prospective student

they obviously had "healing hands" and appeared better suited as a massage therapist. Another ploy

was to convince a prospect to "try" the program in question for at least five (5) days. By getting this

commitment, an admissions representative could ensure that the enrollee would be in the program long

enough to allow ATI to receive payment from loan and grant funds and then the admissions

representative could "flip" them to the program the enrollee wanted, if they insisted on a change. In

this scenario, the prospective students were not told that sitting for five (5) days would mean they

would be charged for a portion of the first program and then charged again once they were re-enrolled

in the program they really wanted.

## D.    FRAUD INVOLVING PROOF OF EDUCATION AND ATB TESTING

43.    Admissions representatives routinely violated enrollment polices by enrolling students who

were not qualified for admission. Falsified high school diplomas and GED certificates were made by

admissions representatives at several ATI campuses including, Campus 10 and Campus 50. In many

instances, these documents were falsified because the admissions representative did not believe that

the potential student could pass an Ability to Benefit ("ATB") test or there was insufficient time

before a program started to allow the prospect to take an ATB test. Admissions representatives and

their supervisors also arranged for friends, family members and paid test takers to take the ATB test

on behalf of student applicants. Some admissions representatives compensated individuals to sit for

these tests to ensure that a prospective student would pass the test. It was a common practice for

admissions representatives to spend as many as four to six hours with an applicant, coaching them on

the test. Admissions representatives utilized practice tests provided by the Wonderlic representative who were supposed to proctor the ATB tests.

44.     ATI utilizes the same Wonderlic proctor at all of its locations. The ATI campuses have a rotating schedule in which the proctor will travel from campus to campus. On multiple occasions, the proctor asked ATI employees to grade the ATB tests so that the proctor could leave and travel to the next campus.

## E.     RE-ENTRY PROGRAM

45.     ATI employs an individual at each campus whose job is to contact former students who did not complete their training and re-enroll them. This person is called a Re-entry Coordinator. In the event that a former student agrees to re-enroll, they are required to sign a new enrollment agreement. Re-entering students do not necessarily return to the same program they were in when they previously dropped. Many students either request to start a different program or are encouraged to start a different program due to the pressure to fill an upcoming program start. The re-entry coordinator is trained not to inform these re-enrollees about the true cost of the program or the amounts of outstanding loans owed.

46.     One of the most difficult aspects of the re-entry coordinator position is making contact with former students. Attempts to contact these former students by phone are not always successful. At some point, Anthony Devore, Executive Director of Campus 10, suggested that the re-entry coordinator at his campus send "second chance" postcards to these former students that gave them an incentive to call back. Devore's idea was to make the former students believe that if they retuned to school, the educational debt they had already incurred would be forgiven. A post card was designed to convey this message, even though ATI had no intention of paying off their existing debt. The only debt that would be forgiven, if any, was the accrued interest on any outstanding cash balance owed directly to the

school.  The post card states:

> "Life does not always give us second chances.
> Here is your chance to **re-enroll in your program** and have the **debt** that you **incurred** to date **forgiven** when you graduate!
>
> Too good to be true?  It is true and we want to help you make a fresh start.
> Give us a call to discuss how you can get back in school and complete your career training in the program of your choice.
>
> Too often our students forget why they started school in the first place.  Take a minute to remember your situation – perhaps a dead-end job, little pay, or feeling like a failure as a parent.  Many of our students feel the same way you did, and they have found that graduating helped them in immeasurable ways.  Do you remember the goals that you set for yourself?  Are you on track to achieve those goals?
>
> **Hurry!! This forgiveness program ends soon.**"

47.     As part of this ploy to lure former students back to ATI, Mr. Devore instructed that the re-entry coordinator not give the students any details over the phone, but instead require them to come to the school to meet with him personally.  Due to the success of this tactic, the post cards were later utilized at other ATI campuses.

48.     Once these students agreed to enroll, they were required to sign new enrollment agreements. Beginning in approximately December of 2008, re-entry coordinators were instructed to fill-out the enrollment agreement with start and completion dates reflecting the full period of time required for completion of the program in question, without any accounting for the hours the re-enrollee had previously received.

## F.     FINANCIAL AID VIOLATIONS

49.     ATI's constant pressure to increase enrollment and thereby generate more revenue also led to the manipulation of financial aid information and documentation.  In many instances, students' qualifications and financial aid information is not verified in order to expedite the enrollment of a prospective student for a given upcoming program start  Enrollees are coached by admissions and

financial aid representatives about their status as "dependent" or "independent" students for purposes of obtaining financial aid, without consideration of their parent's income.

50.     Admissions representatives worked with financial aid representatives to coach enrollees concerning ways to maximize their eligibility for financial aid (including Pell grants). Enrollees were coached to say that they "stayed with their boyfriend" to avoid dependent status. Students were told to get three letters from friends or family stating that they did not live with their parents. Students were coached about how their income and job status would affect their eligibility for grant money.

51.     Financial aid representatives were coached to down-play or not to tell a prospective student that they would have to make cash payments for the portion of their tuition that was not covered by financial aid in order to remain enrolled. Some students were misled to believe that they would be able to "work out" their payments or delay making payments while enrolled. Students were given inaccurate estimates of the amount of available financial aid they qualified for and allowed to start before their financial aid package was complete. As a result, students would find out later that they had not qualified for as much financial aid as promised prior to their start.

52.     One of the programs that included job training assistance and financial aid which was available at ATI was the Workforce Investment Act ("WIA"). Certain dislocated workers could qualify for financial assistance that included education grants. Despite the clear financial benefits of the program, admissions and financial aid representatives were told to steer prospective students away from this program because the qualification process took several months to complete, thus delaying the potential start ready date for the enrollee. Instead, school representatives were told to steer the student to conventional financial aid even though their educational debt at the end of the program would be greater. These students were told that WIA was not the way to go, because it would delay their ability to get a job. They were not told that their debt obligation would be higher.

53.     In April of 2009, the Executive Director of Campus 10, Anthony Devore, stated in a managers

meeting, that "You need to have your financial aid crew be more creative and do whatever they need to

do to get the [new enrollees] qualified for financial aid." At Campus 10, like other campuses, financial

aid representatives manipulated student income data to maximize the student's eligibility for financial

aid.  One financial aid representative recently admitted that for the past several years, he had routinely

understated student applicant income on the FAFSA in order to increase enrollee eligibility for Pell

grants and other financial aid.

54.     Financial aid representatives instructed students to sign incomplete FAFSAS, leaving off the

income information so that the ATI financial aid representative could fill-out the information.

Financial aid representatives obtain FAS pin numbers in order to directly access online FAFSA's and

student FAS account information.   Representatives failed to verify income information and

mischaracterized student information, made unverified assumptions about factual circumstances or

deliberately failed to verify information that reasonably appeared to be inaccurate.

## G.     EDUCATIONAL PROGRAM DEFICIENCIES

55.     One of the big selling points that Admissions Representatives are trained to stress in the

recruiting process are small class sizes, individual instruction and hands-on training.  Despite these

promises, overcrowding occurred at many of the ATI campuses, including Campus 50 and Campus 10.

It was not uncommon to find class rooms that had more students than seats.  At Campus 10, the

problem was so bad that staff had to borrow chairs and tables from another campus, because the

Executive Director, Anthony Devore, refused to authorize the purchase of the needed furniture.

Overcrowding led to the conversion of storage rooms, teacher's lounges and other spaces into class

rooms.  It was not uncommon to see a class room with as many as 60 students with one instructor.

56.     At Campus 10, student labor was used to build classrooms by erecting walls with no ceilings,

resulting in students and instructors in one class room hearing everything that was occurring in an adjacent classroom. This overcrowding led to a shortage of instructors and many classes went for extended periods of time with no permanent instructor. Overcrowding also occurs in the program "labs." Prospective students are promised that they receive hands-on training utilizing industry standard equipment. In the Welding Lab, overcrowding meant that students were forced to stand around with nothing to do, because there is an insufficient number of working welding machines or welding booths. Students constantly complain about broken equipment, the fact that instructors are not present or available in the lab and a constant lack of proper materials and supplies (including steel and other metals) to practice their welding skills. Mr. Devore not only ignored student and staff complaints, but that he failed to maintain a system for properly documenting these complaints.

57.     The physical condition of the facilities and equipment at Campus 10 was grossly deficient. The Welding Lab had significant safety issues. First, the ventilation system for the Welding Lab was dangerously deficient. Each welding booth should have a working ventilation duct to remove the welding gases and airborne particles generated by each welding machine. However, these ducts were not operational. As a result, the air quality was so bad, that many instructors would abandon the lab and leave the students unsupervised. Student and instructor complaints were constant, yet proper improvements did not occur. One instructor began measuring the air quality in the lab with an air quality meter. When Anthony Devore heard about this, he instructed that no further measurements be taken. OSHA complaints were made regarding this problem.

58.     Students, instructors and school staff routinely complained about the condition of the facilities. Part of the problem appeared to be a lack of proper maintenance. On one occasion, someone defecated on the floor of a bathroom in the administrative office area of the school. Despite complaints and requests that the bathroom be cleaned, the human waste was allowed to remain on the bathroom floor

for several days.

59.    Overcrowding and poor facilities also led to numerous staff and faculty complaints. Many instructors were over utilized and forced to work unreasonably long hours in an attempt to accommodate the ever increasing number of enrolled students. Instructor dissatisfaction led to excessive turn-over and the utilization of unqualified staff. Faced with overcrowded classrooms, many instructors became openly hostile to their students – even encouraging them to leave or drop out.

60.    Mr. Devore openly referred to the students at Campus 10 as "crooks and criminals." He was openly hostile to their complaints and unsympathetic to their concerns. He refused to spend money on adequate security despite the fact that vandalism, theft and other crimes occurred on a routine basis in the Campus 10 parking lot. It was common knowledge that drug dealing and other illegal conduct occurred on the Campus 10 property. These problems were largely ignored for extended periods of time.

## H.    CAREER PLACEMENT

61.    The Career Services Department was responsible for student placement. Each campus was required to maintain a 70% placement rate in order to remain accredited and approved in the State of Texas. ATI trained its career placement personnel that a single day of employment by a graduate was sufficient to count that graduate as placed. Although this is consistent with TWC rules, the focus by ATI was to get the student employed for one day by any means necessary.

62.    In order to place students, career service representatives made hundreds of calls a week to potential employers. These representatives were given a written script that was used to sell ATI and its graduates to these companies. Using the script, career services representatives made numerous misrepresentations about ATI's placement process as well as the qualifications and training of its graduates. Prospective employers were told that ATI graduates were carefully screened and only

qualified applicants would be referred to employers.  This was not true.  As part of the career development process, students provided job history and qualification information to the career services representatives who then created a resume for each student that was sent directly to prospective employers.  It was standard practice for the career service representatives to exaggerate a student's experience on these resumes in order to increase the likelihood of placement.  However, career services personnel and school officials were aware that by misrepresenting the graduate's qualifications, it was also more likely that the graduate would be fired when the graduate was unable to perform as represented.

63.     In order for a job placement to count, it was required that the student be placed in a job where 25% or more of the student's duties were in the student's field of study.   Career service representatives routinely counted students as placed when the job placement was not really in the student's field of study.  Examples of this practice include placing an Electronic Systems Technology ("EST") student in a warehouse job where they move boxes of electronic equipment, placing an EST student in a job as a security guard where they have to monitor surveillance cameras and computer monitors and placing a business student in a job as a retail sales clerk or fast food restaurant clerk. One egregious example involved at welding student who was counted as being placed when he obtained employment in a retail sales position at Braum's Ice Cream and Dairy Store.

64.     One common "placement" technique was to characterize a student as "self-employed."  The career services representative would simply ask the student what they wanted to name their business, what hourly rate they would like to charge and what address they wanted to use.  The career service representative would then use a computer to design a simple business card containing the information they obtained from the student and place the card in the student's career services file as evidence of placement.  In reality, the student did not have an actual, viable business.

65.    Many career service representatives would place students by sending them to someone they knew at a temporary agency or company that would "employ" them for a period of time, without any realistic chance of finding jobs in the student's field of study. At best, these graduates would be offered minimum wage position that was not in their field of study.   After a period of time, the temporary agency would drop the student.  In order to meet minimum placement requirements, many students were placed at ATI as lab assistants and paid minimum wage.  Many of these hires would spend the majority of their time doing janitorial duties and other menial tasks at the school.  Any student hired by ATI was counted as a placement.

66.    Career Services was also responsible for contacting recent graduates to determine if they had found a job on their own.  In many instances, it was difficult to locate and/or speak with a given graduate. One method that was employed at the direction of Renaldo Williams (National Director of Career Services), was to create a flyer that was mailed to the graduate's last known address.  The flyer stated that a graduate would receive a $25.00 gift card if they called career services.  However, it also stated that if they called and reported that they had found a job in their field that they would be paid $50.00. It was understood that those who received the flyer would be incentivized to report that they were working in their field.  Ironically, after the system was implemented at Campus 10, the executive director (Anthony Devore) refused to approve the money to buy the gift cards for the students who reported that they were employed.

## I.    ACCREDITATION VIOLATIONS

67.    ATI is accredited through the Accrediting Commission of Career Schools and Colleges of Technology ("ACCSCT").  Accreditation through a nationally recognized accrediting organization is a condition of eligibility to receive FSA student loan funds.  In order to maintain accreditation, the burden rests with ATI to demonstrate *continuous* compliance with the Standards of Accreditation

promulgated by the ACCSCT. Those standards include, but are not limited to: facilities that meet fire, safety and sanitation standards. Physical facilities of sufficient size to create an "effective and suitable learning environment," sufficient equipment and learning stations to allow each student adequate scheduled time for practice, properly maintained machinery and equipment, a sufficient number of qualified faculty to serve the number of students enrolled, faculty members trained in instructional methods and teaching skills, a school catalog that accurately portrays the school and its educational programs, and a minimum required employment rate of 70 percent. ACCSCT accreditation standards also require compliance with recruitment standards prohibiting false or misleading statements, refrain from making payment of cash or other consideration to induce enrollment, making promises of job placement to induce enrollment, recruiter assistance with financial aid applications, and recruiter assistance with admissions testing.

68.     ATI routinely violates many of the ACCSCT accreditation standards. In addition to the violations mentioned elsewhere in this Complaint that also constitute violations of the ACCSCT Standards of Accreditation, ATI takes steps to cover-up these deficiencies during accreditation audits. These actions include falsification of documentation in student files as part of internal audit procedures to prepare for accreditation audits and audits by governmental agencies such as the Texas Work Force Commission.

## V.
### FIRST CLAIM FOR RELIEF

### FALSE CLAIMS ACT. 31 U.S.C. § 3729(a)(l)(A) - FALSE CLAIMS

69.     Plaintiff re-alleges and incorporates all of the allegations contained in the preceding paragraphs.

70.     Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the United States Government false and fraudulent claims, records, and statements in order to obtain federal student loan funding for students enrolled at their campuses.

71.     Through the acts described above, and otherwise, Defendants and their agents knowingly made, used, and/or caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States government.

72.     Through the acts described above and otherwise, Defendants, their agents and employees knowingly made, used and caused to be made or used false records and statements to conceal, and increase Defendants' entitlement to receive federal funding. Defendants also failed to disclose to the government material facts that would have resulted in Defendants' ineligibility to receive federal funding.

73.     Plaintiff United States has sustained damages as a result of Defendants' false or fraudulent claims in an amount to be determined at trial.

74.     The United States and its fiscal intermediaries, unaware of the falsity of the records, statements, and claims made or submitted by Defendants, their agents and their employees paid and continue to pay Defendants for claims that would not have been paid had Defendants not submitted false claims for payment.


# VI.
## SECOND CLAIM FOR RELIEF

### FALSE CLAIMS ACT. 31 U.S.O § 3729(a)(1)(B) - FALSE STATEMENTS

75.     Plaintiff re-alleges and incorporates all of the allegations contained in the preceding

---

paragraphs.

76.     Through the acts described above, Defendants, their agents and their employees knowingly presented and caused to be presented to the United States Government false and fraudulent claims, records, statements in order to obtain federal student loan funding for students enrolled at their campuses.

77.     Through the acts described above, and otherwise, Defendants, their agents and their employees knowingly made, used, and/or caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States government.

78.     Through the acts described above and otherwise, Defendants, their agents and their employees knowingly made, used and caused to be made or used false records and statements to conceal, and increase Defendants entitlement to receive federal funding. Defendants also failed to disclose to the federal government material facts that would have resulted in Defendants' ineligibility to receive federal funding.

79.     The United States and its fiscal intermediaries, unaware of the falsity of the records, statements, and claims made or submitted by Defendants, their agents and their employees paid and continue to pay Defendants for claims that would not have been paid if Defendants had not submitted false claims for payment.

80.     By reason of Defendants' false records, statements, claims and omissions and the acts taken in furtherance thereof, the United States have been damaged in the amount of many millions of dollars in Federal Student Aid funding.

## VII.
## THIRD CLAIM FOR RELIEF

### FRAUD and FRAUD IN THE INDUCEMENT - AGAINST THE UNITED STATES

81.    Plaintiff re-alleges and incorporates all of the allegations contained in the preceding paragraphs.

82.    The Defendants' misrepresentations and omissions to Plaintiff were made intentionally, or made recklessly without any knowledge of their truth. Defendants made the above misrepresentations and omissions with the intent that the Plaintiff rely on them. Defendants knew that the misrepresentations or omissions were material to Plaintiffs decisions to enter into contracts with Defendant.

83.    Plaintiff relied on the material misrepresentations or omissions and has sustained damages in an amount to be determined at trial.

84.    The United States and its fiscal intermediaries, unaware of the falsity of the records, statements, and claims made or submitted by Defendants, their agents and their employees paid and continue to pay Defendants for claims that would not have been paid had Defendants not submitted false claims for payment.

## VIII.
## FOURTH CLAIM FOR RELIEF

### FALSE CLAIMS ACT CONSPIRACY

85.    Plaintiff re-alleges and incorporates the all of the allegations contained in the preceding paragraphs.

86.    Defendants are liable under 31 U.S.C. § 3729(a)(3).

87.     This is a claim for treble damages and forfeitures under the False Claims Act 31 U.S.C. §§ 3729, *et seq.*

88.     Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and with others to defraud the United States by getting false and fraudulent claims allowed or paid. Defendants have also conspired to omit disclosing or to actively conceal facts, which if known, would have reduced or eliminated government obligations and benefits to them.  Defendants have taken substantial steps in furtherance of those conspiracies by falsifying IPEDS reports and other records by submitting such records to the federal government for payment or approval and by directing their agents, consultants and personnel to not disclose and/or to conceal Defendants' fraudulent practices.

89.     The United States and its fiscal intermediaries were unaware of Defendants' conspiracies or the falsity of the records, statements and claims made by Defendants and their agents, their employees and their co-conspirators. As a result, Plaintiff has paid and continues to pay millions of dollars in Federal Student Aid that it would not otherwise have paid.

90.     By reason of Defendants' conspiracies and the acts taken in furtherance thereof, the United States has been damaged in the amount of many millions of dollars in Federal Student Aid funding.

## IX.
## FIFTH CLAIM FOR RELIEF

### FALSE CLAIMS ACT, 31 U.S.C. 3729(a)(1)(G) – FALSE CLAIMS

91.     Plaintiffs re-allege and incorporate the all of the allegations contained in the preceding paragraphs.

92.     Through the acts described above, Defendants, their agents and their employees knowingly

made, used, or caused to be used, a false record or statement to conceal, avoid, or decrease and

obligation to pay or transmit money or property to the government.

93. By reason of Defendants' false records, statement, claims and omissions and the acts taken in

furtherance thereof, the United States have been damaged in the amount of many millions of dollars

in Federal Student Aid funding.


## X.
## NOTICE TO THE UNITED STATES

94. (a) As required under the False Claims Act, 31 U.S.C. § 3730(b)(1), Relators, simultaneously

with the filing of this Complaint, provided to the United States Attorney for the Northern District of

Texas a statement of all material evidence and information related to Relator's Original Complaint.

(b) This disclosure statement supports the existence of "submission of a knowingly false or

fraudulent claim for payment or approval," under the False Claims Act (31 U.S.C. § 3729(a)(1)).


## XI.
## JURY DEMAND

95. Plaintiff and Relators request a jury trial.

## XII.
## PRAYER

WHEREFORE, Plaintiff and Relators pray that this Honorable Court enter judgment

against Defendants as follows:

A. That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*

B. That Defendants are liable to Plaintiff in an amount equal to three times the amount
of damages the United States has sustained as a result of Defendants' actions, as well
as a civil penalty against each Defendant for each violation of 31 U.S.C. § 3729;

---

C.   That the Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §
     3730(d);

D.   That the Relators be awarded all costs and expenses of this action including
     attorney's fees; and

E.   That the United States and Relators receive all such other relief as the court deems
     just and proper.

Respectfully submitted,

**JOEL T. GOMEZ**
Texas State Bar No. 00784142

**THE GOMEZ LAW GROUP, PLLC**
14135 Midway Road
Suite 250
Addison, TX  75001
Phone: (214) 389-0998
Facsimile: (214) 389-0986
tgomez@gomezlawyers.com

**JS 44** (Rev. 12/07)

## CIVIL COVER SHEET

~~SEALED~~

~~ORIGINAL~~

3-09CV1313-G

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS

United States of America, ex rel Portia Aldredge, Tiffany Turner, Monica Lewis, James Lewis, Nathan Wallace, and Lori Jackson

### DEFENDANTS

ATI Enterprises, Inc., ATI Enterprises of Florida, Inc., and ATI Acquisition Company

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Tarrant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

RECEIVED
BY _____
JUL 14 2009

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Joel T. Gomez, Gomez Law Group, PLLC, 14135 Midway Rd., Ste. 250, Addison, TX 75001, 214-389-0998

Attorneys (If Known)

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 U.S.C. §§3729, et seq.

Brief description of cause:
False Claims Act

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   07/14/2009

SIGNATURE OF ATTORNEY OF RECORD   _Joel T Gomez_

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____