ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| PORTIA ALDRIDGE, TIFFANY | § | |
| TURNER, MONICA LEWIS, | § | |
| JAMES LEWIS, NATHAN | § | SEALED |
| WALLACE, and LORI JACKSON, | § | |
| | § | |
| QUI TAM PLAINTIFFS, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:09-CV-1313-G |
| ATI ENTERPRISES, INC. d/b/a | § | |
| ATI TECHNICAL TRAINING | § | |
| CENTER, ATI CAREER TRAINING | § | **FILED IN SEALED CASE** |
| CENTER, and ATI CAREER | § | |
| TRAINING, | § | |
| | § | |
| DEFENDANT. | § | |

**UNITED STATES' COMPLAINT**

Plaintiff, the United States of America, by its undersigned counsel, represents as follows:

**I. INTRODUCTION**

1.     Plaintiff, the United States of America (United States), brings this action to

recover treble damages, civil penalties, and costs under the False Claims Act, 31 U.S.C. §§ 3729-

33 (FCA), and to recover damages and other monetary relief under the common law and

equitable theories of unjust enrichment and payment by mistake.

2.     This action arises from false statements and claims that Defendant ATI

Enterprises, Inc. (ATI) knowingly presented to, or caused to be presented to, the United States

and the United States Department of Education (Department of Education), in violation of the FCA and common law.

3.      ATI knowingly presented and/or made, or caused to be presented and/or made, the false claims and statements at issue, in order to participate in the federal student aid programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq.* (Title IV, HEA programs). The Title IV, HEA programs, which are administered by the Department of Education, provide students with financial aid in the form of, among other things, Federal Pell Grants and loans guaranteed by the Federal Government. From at least 2007 through 2010, ATI knowingly submitted, or caused to be submitted, numerous false claims for payment to the Department of Education arising from ATI's fraudulent course of conduct.

4.      In order to be eligible to receive federal funding under Title IV, ATI was required to adhere to a variety of regulations related to the operation of its for-profit, proprietary schools. *See, e.g.,* 34 C.F.R. Parts 600, 668. ATI entered into contractual agreements with the Department of Education, called Program Participation Agreements (PPAs), in which ATI specifically agreed to abide by these regulations. Execution of these PPAs with the Department of Education was a condition precedent to ATI's eligibility to receive federal funding under Title IV of the Higher Education Act (HEA). ATI also certified each time it drew down federal grant monies that the funds were being expended in accordance with the conditions of the applicable PPAs.

5.      Among other things, ATI was required to maintain a license to operate in each state in which its campuses were located and to maintain accreditation by an accrediting agency recognized by the Secretary of Education for that purpose. ATI was further prohibited from making any false representations to prospective students regarding, among other things, the

employability of its graduates upon graduation.  ATI agreed that it would comply with these and other requirements in each PPA it executed.

6.       Beginning in at least 2007 and continuing through 2010, ATI engaged in a widespread scheme to defraud the Department of Education and the Texas Workforce Commission (TWC) – the state agency responsible for the licensing of proprietary schools in Texas – in order to receive federal funding it would not otherwise have been entitled to receive. ATI's fraudulent conduct involved at least three of ATI's North Texas campuses:  Maple Avenue Campus (Campus 10), North Richland Hills Campus (Campus 30), and Technology Boulevard Campus (Campus 50).

7.       ATI made false statements and concealed material information from both the TWC and the Department of Education in order to ensure that it would maintain its state license and/or continue to receive federal funding under Title IV of the HEA.  For example, TWC regulations require that a proprietary school maintain a 60 percent placement rate to be eligible for licensure in Texas.  ATI fabricated placement statistics for graduates of Campuses 10, 30 and 50 in order to make it appear as if ATI placed substantially more ATI graduates in their fields of study than ATI actually did.  ATI reported and certified as "true and correct" these false placement statistics to the TWC.  By falsifying its placement statistics, ATI was able to ensure that it maintained its state license.  State licensure, in turn, is a requirement to be eligible for federal funding under Title IV of the HEA.

8.       ATI also engaged in false advertising in an attempt to induce students to enroll at its campuses, in violation of Texas regulations, federal regulations implementing Title IV of the HEA, and its PPAs.  For example, ATI recruiters used the fabricated placement statistics ATI reported to the TWC as a tool to induce students to enroll at Campuses 10, 30 and 50.  ATI

recruiters lied to prospective students at Campuses 10, 30, and 50 about the amounts of money they should expect to earn in their chosen fields after graduation from ATI. ATI also enrolled certain students into particular programs of study without telling those students that they would likely be disqualified from employment in their chosen fields upon graduation (*e.g.*, because of a prior felony conviction). As a result of ATI's misrepresentations, these students expended significant time learning a trade, and incurred substantial debt, only to be barred from employment in their fields upon graduation. At Campus 10, ATI recruiters told applicants who had previously dropped out of ATI that their current loan indebtedness to the Federal Government would be forgiven if they re-enrolled at ATI. But ATI had no intention of repaying the students' federal loan indebtedness. ATI's false advertising to prospective applicants, in violation of Texas regulations, federal regulations, and its PPAs, was designed to induce students to enroll at ATI who might not otherwise have enrolled had they been told the truth by ATI.

9.      ATI engaged in other fraudulent conduct in an attempt to secure federal aid for students who, but for ATI's conduct, would have been ineligible for assistance under Title IV of the HEA. For instance, ATI fabricated high school diplomas of prospective students at Campuses 10, 30 and 50 in order to permit unqualified students to enroll at ATI. ATI then improperly received and retained Title IV assistance for those unqualified students. ATI also engaged in a variety of fraudulent actions designed to ensure that prospective students passed an Ability-to-Benefit (ATB) test – a then-existing alternative under federal law for students without a high school diploma or its recognized equivalent to receive Title IV funding while enrolled at ATI. ATI's actions included: (1) using surrogate test takers to sit for ATI applicants; (2) improperly "coaching" test takers on the questions and answers before the exam; and (3) using a proctor to administer the tests who had previously been decertified by the ATB testing company

for misconduct.  ATI also routinely altered grades and attendance records of students at

Campuses 10, 30 and 50 who were not meeting minimum requirements.  ATI kept students on its

attendance rolls – and, as such, federal financial aid recipient list – by extending graduation dates

fraudulently as well.  Finally, ATI employees falsified financial aid records in order to secure

more federal funding for students than the students were eligible to receive.

10.     ATI's conduct was knowing and material to ATI's continued eligibility to

participate in the Title IV programs.  As a result of ATI's fraudulent scheme and its false

representations of Title IV eligibility, ATI has received millions of dollars of Title IV financial

aid that it otherwise would not have received but for its conduct.

## II. JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the United States' claims brought

under the False Claims Act, 31 U.S.C. §§ 3279, *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732.

This Court has supplemental jurisdiction to entertain the common law and equitable causes of

action under 28 U.S.C. § 1367(a).

12.     This Court has personal jurisdiction over ATI pursuant to 31 U.S.C. § 3732(a)

because ATI transacts business and is found in this district, and acts proscribed by 31 U.S.C.

§ 3729 occurred in this district.

13.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28

U.S.C. §§ 1391(b) and 1395(a), because ATI is a Texas corporation and owns and operates

traditional campuses within this district.  Furthermore, certain of the acts that form the basis of

this Complaint occurred in this district.

### III. **PARTIES**

14.     Plaintiff is the United States of America, acting on behalf of the Department of Education.  The Department of Education is a federal agency that, among other things, administers the student financial assistance provisions under Title IV of the HEA.

15.     Relator Portia Aldridge is a resident of Dallas County, Texas.  She was employed as a Career Services Coordinator and Director of Career Services for ATI from September 20, 2006 through December 18, 2008 and worked at the campuses located at 10003 Technology Blvd., W. Dallas, TX 75220 (Campus 50) and 6627 Maple Ave., Dallas TX 75235 (Campus 10).

16.     Relator Tiffany Turner is a resident of Tarrant County, Texas.  She was employed as an Admissions Representative and Assistant Director of Admissions for ATI from July 25, 2006 through March 26, 2009 and worked at the following locations:  2998 Stemmons Freeway, Dallas, TX 75247 (Campus 57), 6351 Boulevard 25, North Richland Hills, TX 76180 (Campus 30), Campus 50, and Campus 10.

17.     Relator Monica Lewis is a resident of Dallas County, Texas.  She was employed as an ATB Advisor for ATI from April 21, 2008 until March 17, 2009, and worked at Campus 50.

18.     Relator James Lewis is a resident of Dallas County, Texas.  He was employed as a Job Developer and Re-entry Coordinator for ATI from February 21, 2007 through September 3, 2010 at Campus 30 and Campus 10.

19.     Relator Nathan Wallace is a resident of Tarrant County, Texas.  He was employed as a Manager of Admissions and Director of Admissions for ATI from November 2007 to May 19, 2009 at Campus 50 and Campus 10.

20.     Relator Lori Jackson is a resident of Kaufman County, Texas.  She was employed as a Financial Aid Advisor for ATI from March 27, 2009 until June 1, 2009 and worked at the ATI corporate offices in North Richland Hills, Texas, with ATI's online program.

21.     Defendant ATI Enterprises, Inc., d/b/a ATI Technical Training Center, ATI Career Training Center, and ATI Career Training (ATI), is a corporation organized under the laws of the State of Texas, whose principal place of business is located at 331 Boulevard 26, # 275, North Richland Hills, Texas 76180-1591.  It is a privately-held, for-profit proprietary college that awards career diplomas and industry certifications in a variety of career fields.  ATI operates campuses throughout North Texas, as well as in other parts of Texas and other states.

## IV. FEDERAL STATUTORY BACKGROUND

### A.     The Federal False Claims Act

22.     The False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. 111-21, § 4(f), 123 Stat. 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A) (2009).  Prior to the FERA amendments, the FCA provided that a person is liable to the United States government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government…[a] false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1) (2006).

23.     The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has

title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded...." 31 U.S.C. § 3729(b)(2)(A) (2009).

24.     As amended by FERA, the FCA also makes a person liable to the United States government for three times the amount of damages which the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).  The FCA, prior to the FERA amendments, provided that a person is liable to the United States government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (2006).

25.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information;" (2) "acts in deliberate ignorance of the truth or falsity of the information;" or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A) (2009).  The FCA further provides that "no proof of specific intent to defraud" is required.  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2009).

26.     The United States alleges that, from at least 2007 through 2010, ATI violated the FCA by "knowingly" submitting and/or causing the submission of false claims for payment to

the Department of Education in the form of Free Applications for Federal Student Aid (FAFSA) and the resulting drawdowns of Title IV funds related to each approved FAFSA. These claims for payment were false because ATI: (1) fraudulently maintained its state licensure (and, in turn, its eligibility to receive Title IV funding) by making false statements and misrepresentations to the TWC about its placement rates, among other things; (2) made knowingly false statements and promises in its PPAs, and in certifications accompanying its drawdowns of federal aid, that it was complying with, and would continue to comply with, applicable laws and regulations governing the award of Title IV funding; and/or (3) made, or caused to be made, false representations in grant and loan applications that the students seeking federal financial aid were eligible to receive such aid.

### B.      Programs under Title IV of the Higher Education Act of 1965

27.      Under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.,* Congress established various student loan and grant programs, including but not limited to, the Federal Pell Grant Program (Pell), the Federal Family Education Loan Program (FFELP), and the Federal Direct Loan Program (FDLP) in order to financially assist eligible students in obtaining a post-secondary education.

### 1.      Federal Regulations Governing Title IV Funding

28.      There are a variety of federal statutes and regulations that govern the award of Title IV, HEA program funds. First, only "eligible" students are permitted to receive federal financial aid under Title IV of the HEA. In order to qualify as an eligible student, a student must meet the requirements of 34 C.F.R. § 668.32. Among other things, the student must be enrolled or accepted for enrollment in an eligible program at an eligible institution; must have a high school diploma or its recognized equivalent, unless an enumerated exception applies (such as,

during the relevant time period, having "obtained a passing score specified by the Secretary on an independently administered test"); and must be maintaining satisfactory academic progress in his or her course of study according to the school's published standards, and in accordance with federal guidelines. 34 C.F.R. §§ 668.32, 668.34.

29.     An institution may only retain Title IV funds that it earns.  When a student withdraws without completing a program of instruction, an institution must calculate the amount of Title IV funds that it can retain and refund to the Department of Education and the student any excess funds that it has not earned.  34 C.F.R. § 668.22.

30.     Institutions wishing to participate in Title IV, HEA programs also must comply with other federal requirements.  A school must be accredited and be licensed to operate in each state in which it is doing business in order to be eligible to receive Title IV funding.  20 U.S.C. § 1001; 34 C.F.R. § 600.5(a)(4), (6).  In Texas, the TWC is the state entity that licenses career schools.  In order to be eligible for licensure in Texas, a school must, among other things:

> a.  report its completion, employment, and placement rates to the TWC (TEX. EDUC. CODE §§ 132.055(5), (15));
>
> b.  "not utilize erroneous or misleading advertising, either by actual statement, omission, or intimation as determined by the commission" (TEX. EDUC. CODE § 132.055(12));  and
>
> c.  "furnish[] to the [TWC] for approval or disapproval admission requirements for each program offered by the school or college" (TEX. EDUC. CODE § 132.055(16)).

31.     Federal regulations also prohibit institutions from making substantial misrepresentations to prospective applicants about, among other things, the nature of the

institution's educational programs or the employability of its graduates. 34 C.F.R. Part 668,

Subpart F. During the relevant time period, a misrepresentation consisted of "any false,

erroneous or misleading statement" that an institution made to a student or prospective student,

and a substantial misrepresentation consisted of "any misrepresentation on which the person to

whom it was made could reasonably be expected to rely, or has reasonably relied, to that

person's detriment." 34 C.F.R. § 668.71 (2007-2010).

32.     Misrepresentations that were explicitly prohibited by federal regulation include,

among other things, misrepresentations regarding the employability of an eligible institution's

graduates, 34 C.F.R. § 668.74, and misrepresentations concerning "the nature of an institution's

financial charges," 34 C.F.R. § 668.72.

33.     The Department of Education has the authority to revoke or terminate an

institution's PPA if it is found to have engaged in substantial misrepresentation. 34 C.F.R. §§

668.13(d); 668.86(a)(1)(ii)(A).

## 2.   **Program Participation Agreements**

34.     All post-secondary educational institutions must enter into PPAs with the

Department of Education in order to become eligible to receive payment of Title IV funds under

programs such as Pell, FFELP, or FDLP, or to have its students receive Title IV funding. 20

U.S.C. § 1094; 34 C.F.R. § 668.14.

35.     "A program participation agreement conditions the initial and continued

participation of an eligible institution in any Title IV, HEA program upon compliance with the

provisions of this part, the individual program regulations, and any additional conditions

specified in the program participation agreement that the Secretary requires the institution to

meet." 34 C.F.R. § 668.14(a)(1).

36.     By signing a PPA, an educational institution agrees that its participation in Title IV, HEA programs, including receiving payment of Title IV funds, is "subject to the terms and conditions set forth in [the PPA]."

37.     Each PPA expressly conditions a school's initial and continuing eligibility to receive payment under Title IV, HEA programs on compliance with specific statutory requirements that include the proper determination of student eligibility for these funds, and compliance with all institutional eligibility requirements, such as those set forth in paragraphs 28-33 above.

## C.     Claims for Payment under Title IV Programs

38.     After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways.  Under Pell and FDLP, for example, students submit requests for funding directly to the Department of Education, or to the Department of Education with the assistance of schools.  Under the FFELP, students and schools jointly submit requests to private lenders for loans that are then guaranteed by state agencies and are, in turn, insured by the Department of Education and paid in the event of a default.

39.     With respect to all Title IV, HEA programs, the disbursement of federal funds rests on required statements of eligibility.  Schools must make such statements for payment requests to be considered.

40.     For all Title IV, HEA programs, students who are interested in receiving federal student aid must complete a FAFSA.

### 1.     Title IV Grant Programs

41.     Under the Pell Grant program, which provides federal funds to assist post-secondary school students in financial need, 20 U.S.C. § 1070a; 34 C.F.R. § 690.1, the student

initiates the process by submitting a FAFSA to the Department of Education to have her

expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell

funds. 34 C.F.R. § 690.12(a). The student either sends the FAFSA directly to the Department of

Education or provides it to a school for the school to transmit to the Department of Education on

the student's behalf. 34 C.F.R. § 690.12(b).

42.     The Department of Education sends the student's application information and

EFC to the student on a Student Aid Report ("SAR") and sends each school the student has

designated an Institutional Student Information Record ("ISIR") for that student. 34 C.F.R.

§ 690.13.

43.     The school uses the above-described information, including the EFC, to calculate

the student's eligibility for all aid and to assemble a "financial aid award package" for the

student borrower. The financial aid package may include Pell Grants, FDLP Direct Loans, or

Campus-Based Aid (which, in turn, includes Federal Supplemental Educational Opportunity

Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for

which the student may be eligible.

44.     The student can accept all or part of the financial aid award package.

45.     If the student accepts a Pell Grant, an FDLP Direct Loan (for which the

Department of Education is both lender and guarantor), or both a Pell Grant and a Direct Loan,

the school creates an electronic "origination" record that the school submits to a Department of

Education computerized database called "COD," the Common Origination and Disbursement

system. The origination record includes student demographic data, the award or payment period,

the award amount, and disbursement dates and amounts. The COD database, in turn, links the

information in the origination record to another Department of Education database, called

"CPS," the Central Processing System, which compares the information in the origination record to the information on the student's SAR and ISIR.

46.     Provided that the information submitted by the school is consistent with the information possessed by the Department of Education, the Department of Education makes funds available for the school to electronically draw down from a computerized system known as "G5."

47.     Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request…the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement."

48.     In addition to the Pell Grants themselves, the Department of Education also pays to the school an annual administrative cost allowance of $5.00 for each student who receives a Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV, HEA federal student aid programs. 20 U.S.C. § 1096; 34 C.F.R. § 690.10.

## 2.     Title IV Loan Programs

49.     Under the FFELP, which includes subsidized and un-subsidized Stafford Loans, a guaranty agency makes the eventual claim for payment by the United States. No new loans were made under FFELP after July 1, 2010. Prior to that date, the school and student submitted an application to a private lender for a loan on behalf of the student. If a student defaults in repaying a loan under the FFELP program, a state or private guaranty agency reimburses the lender or subsequent holder of the loan for the outstanding balance and takes assignment of the loan for collection action. 34 C.F.R. § 682.401(b)(14). If the guaranty agency is unable to collect from the borrower, the Department of Education reimburses the guaranty agency for the loss it incurred in honoring the defaulted claims, 230 U.S.C. § 1078(c)(1)(A), and the

Department of Education may, in its discretion, take assignment of the loan.  20 U.S.C.

§ 1078(c)(8).  In this way, the government is ultimately called upon to satisfy claims for

payment.

50.     In order to participate in the FFELP or any other Title IV loan program, as

opposed to a grant program, a student completes a Master Promissory Note (MPN) and submits

the MPN to the educational institution.  The institution, in turn, completes a "School

Certification," in which it certifies the accuracy of the information it provided to the Department

of Education and the student's eligibility for the loan.  34 C.F.R. § 682.102.  While the MPN

itself is valid for ten years, the educational institution determines the student's ongoing eligibility

for aid and completes the School Certification annually.

51.     Under the FFELP, the educational institution submits the MPN to the lender.

Upon approval by the lender, the lender obtains a loan guarantee from a guarantee agency.  34

C.F.R. § 682.102.  The loan is made in reliance upon the accuracy of the information provided

by the educational institution.

52.     The lender transfers the FFELP funds directly into the educational institution's

account.  Upon receiving the FFELP funds, the educational institution credits a student's account

for education-related expenses, such as tuition, fees, books, and supplies.

53.     For subsidized Stafford Loans, the government pays the interest on the student's

behalf during the time the student is enrolled in school on at least a half-time basis, and during

the student's grace period before repayment commences.  34 C.F.R. § 682.102(d)(2).

54.     In the event of default on the loan, the Department pays to the guarantee agency

all or part of the unpaid principal and accrued interest, as well as a variety of administrative

costs.  34 C.F.R. § 682.404.

**D.**     <u>ATI's Participation in Title IV, HEA Programs</u>

    **1.**     <u>Program Participation Agreements</u>

55.     ATI signs and submits PPAs to the Department of Education on behalf of all of ATI's educational institutions throughout the United States. The chart below identifies the PPAs signed by ATI and the Department of Education from 2004 through the present for ATI's Campuses 10, 30 and 50.

| School | Address | Ope Id. No. | Date PPA Signed by ATI | Date PPA Signed by DOE | PPA Approval Expiration Date |
|---|---|---|---|---|---|
| ATI Technical Training Center (Campus 10) | 6627 Maple Ave. Dallas, TX 75235-4622 | 01248200 | 10/18/04 | 10/21/04 | 6/30/08 |
| ATI Technical Training Center (Campus 10) | 6627 Maple Ave. Dallas, TX 75235-4622 | 01248200 | 6/20/08 | 6/27/08 | 3/31/14 |
| ATI-Career Training Center (Campus 30) | 235 NE Loop 820 Suite 110 Hurst, TX 76052-7396 | 02596500 | 10/18/04 | 10/21/04 | 6/30/08 |
| ATI-Career Training Center (Campus 30) | 6351 Boulevard 26 Suite 100 North Richland Hills, TX 76180-1599 | 02596500 | 6/16/08 | 6/27/08 | 3/31/14 |
| ATI Career Training Center (Campus 50) | 10003 Technology Blvd., W. Dallas, TX 75220-443 | 02596600 | 10/18/04 | 10/21/04 | 6/30/08 |
| ATI Career Training Center (Campus 50) | 10003 Technology Blvd., W. Dallas, TX 75220-4443 | 02596600 | 6/16/08 | 6/30/08 | 3/31/14 |

56.     The PPAs signed by ATI state that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."

57.     By signing the PPAs, ATI certified that it would comply with Title IV of the HEA's requirements.  All of the PPAs signed by ATI state:  "[t]he Institution understands and agrees that it is subject to and will comply with the program statutes and implementing regulations for institutional eligibility as set forth in 34 CFR Part 600 and for each Title IV, HEA program in which it participates, as well as the general provisions set forth in Part F and Part G of Title IV of the HEA, and the Student Assistance General Provisions regulations set forth in 34 C.F.R. Part 668."

58.     ATI also certified in each PPA that "[i]t will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA…."

59.     ATI also agreed in the PPAs to meet all state licensure and accreditation requirements:  "[ATI] will meet the requirements established pursuant to Part H of Title IV of the HEA by the Secretary, State [authorizing bodies], and nationally recognized accrediting agencies."

60.     Each of the PPAs signed by ATI further state:  "In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment-

(i)     The most recent available data concerning employment statistics,

graduation statistics, and any other information necessary to

substantiate the truthfulness of the advertisements; and

(ii)    Relevant state licensing requirements of the State in which the

institution is located for any job for which an educational program

offered by the institution is designed to prepare those prospective

students."

61.     All of the PPAs identified in paragraph 55 above were signed either by ATI's

President, Joe Mehlmann, or ATI's CEO, Arthur Benjamin.

62.     As described in greater detail below, ATI knowingly made false statements,

certifications, and claims regarding its compliance with Department of Education regulations and

the terms of its PPAs.  Beginning in at least 2007, ATI was fraudulently maintaining its licensure

with the TWC (and, hence, its eligibility to participate in Title IV programs) by, among other

things, fabricating placement rates.  ATI was also violating federal regulations by repeatedly

lying to students about, among other things, the opportunities they would have as ATI graduates

to induce them to enroll at ATI.  In order to secure greater federal funding, ATI also enrolled and

maintained enrollment for students who were not eligible, and then concealed their ineligibility

by fabricating documents.

63.     ATI nevertheless executed the PPAs and agreed that it would comply with

applicable federal regulations and the terms of the PPAs.  ATI then drew down federal grant

funds and again stated that the funds were being used in accordance with the conditions of the

PPAs.  ATI's statements were false when made, and caused the Department of Education to pay

various claims under Title IV, HEA programs that it would not have paid but for ATI's fraud.

### 2.   Federal Funds Received from the Department of Education

64.     ATI has received substantial sums in Title IV funding from the Department of Education as a result of its fraudulent conduct.

65.     During the 2005/2006 academic year through the 2011/2012 academic year, ATI records reflect it received at least $77,554,609 in Title IV funds for students enrolled at Campus 10:

| Fund Source[1] | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 | 2010-11 | 2011-12 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| DL SUB | $0 | $0 | $0 | $1,300,760 | $5,307,508 | $3,575,410 | $164,109 | $10,347,787 |
| DL UNSUB | $0 | $0 | $0 | $1,981,825 | $7,717,450 | $4,870,285 | $233,611 | $14,803,170 |
| DLPLUS | $0 | $0 | $0 | $195,350 | $404,784 | $212,236 | $7,808 | $820,178 |
| PELL | $1,509,096 | $2,511,108 | $3,114,519 | $4,652,324 | $7,292,827 | $5,270,956 | $422,935 | $24,773,765 |
| PLUS | $283,330 | $337,011 | $279,728 | $116,692 | $7,437 | $0 | $0 | $1,024,199 |
| SEOG | $187,431 | $169,128 | $233,451 | $204,759 | $187,318 | $182,623 | $17,576 | $1,182,287 |
| SUB | $1,457,758 | $2,387,712 | $3,587,377 | $3,126,722 | $211,216 | $0 | $0 | $10,770,785 |
| UNSUB | $2,003,562 | $3,012,464 | $3,864,106 | $4,563,219 | $259,533 | $0 | $0 | $13,702,883 |
| FWS | $0 | $14,205 | $22,968 | $33,936 | $0 | $58,446 | $0 | $129,555 |
| Grand Total | $5,441,177 | $8,431,628 | $11,102,149 | $16,175,587 | $21,388,073 | $14,169,956 | $846,039 | $77,554,609 |

66.     During the 2005/2006 academic year through the 2011/2012 academic year, ATI records reflect it received at least $77,666,965 in Title IV funds for students enrolled at Campus 30:

| Fund Source | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 | 2010-11 | 2011-12 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| DL SUB | $0 | $0 | $2,890 | $1,923,946 | $6,078,833 | $5,505,393 | $269,144 | $13,780,206 |
| DL UNSUB | $0 | $0 | $2,700 | $2,629,202 | $7,450,023 | $7,089,911 | $351,284 | $17,523,120 |
| DLPLUS | $0 | $0 | $0 | $549,016 | $794,096 | $604,207 | $38,308 | $1,985,627 |

[1] DL SUB: Direct Loan Subsidized
DL UNSUB: Direct Loan Unsubsidized
DLPLUS: Direct Loan Plus
PELL: Pell Grant
PLUS: Plus loan
SEOG: Supplemental Educational Opportunity Grant
SUB: Subsidized
UNSUB: Unsubsidized
FWS: Federal Work Study

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PELL | $1,499,574 | $1,420,309 | $1,995,713 | $3,556,314 | $7,852,491 | $7,703,499 | $605,627 | $24,633,527 |
| PLUS | $332,452 | $289,480 | $434,625 | $274,373 | $3,329 | $0 | $0 | $1,334,259 |
| SEOG | $168,161 | $143,419 | $130,815 | $113,397 | $88,310 | $96,946 | $200 | $741,249 |
| SUB | $1,279,813 | $1,415,310 | $2,631,732 | $2,547,629 | $170,049 | $0 | $0 | $8,044,534 |
| UNSUB | $1,607,437 | $1,711,818 | $2,662,081 | $3,418,588 | $128,594 | $0 | $0 | $9,528,519 |
| FWS | $23,427 | $30,235 | $42,262 | $0 | $0 | $0 | $0 | $95,924 |
| Grand Total | $4,910,863 | $5,010,573 | $7,902,819 | $15,012,465 | $22,565,725 | $20,999,956 | $1,264,563 | $77,666,965 |

67.   During the 2005/2006 academic year through the 2011/2012 academic year, ATI records reflect it received at least $80,823,347 in Title IV funds for students enrolled at Campus 50:

| Fund Source | 2005-06 | 2006-07 | 2007-08 | 2008-09 | 2009-10 | 2010-11 | 2011-12 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| DL SUB | $0 | $0 | $1,733 | $1,121,435 | $4,511,030 | $3,528,140 | $100,496 | $9,262,834 |
| DL UNSUB | $0 | $0 | $1,980 | $1,630,855 | $5,869,781 | $4,282,376 | $132,797 | $11,917,789 |
| DLPLUS | $0 | $0 | $0 | $86,214 | $158,377 | $78,680 | $3,249 | $326,520 |
| PELL | $2,711,572 | $2,952,414 | $3,713,478 | $4,629,554 | $6,568,808 | $5,174,609 | $288,144 | $26,038,578 |
| PLUS | $278,082 | $179,611 | $202,835 | $130,568 | $7,175 | $0 | $0 | $798,271 |
| SEOG | $250,557 | $225,747 | $221,382 | $198,231 | $183,662 | $182,436 | $420 | $1,262,435 |
| SUB | $2,589,897 | $2,727,816 | $4,392,694 | $4,082,126 | $763,281 | $0 | $0 | $14,555,814 |
| UNSUB | $2,904,367 | $3,124,802 | $4,186,750 | $5,331,423 | $887,380 | $0 | $0 | $16,434,722 |
| FWS | $43,730 | $44,050 | $30,408 | $22,120 | $44,052 | $42,024 | $0 | $226,384 |
| Grand Total | $8,778,205 | $9,254,440 | $12,751,260 | $17,232,526 | $18,993,546 | $13,288,264 | $525,106 | $80,823,347 |

68.   In total, from the 2005/2006 academic year through the 2011/2012 academic year, ATI records reflect it received at least $236,044,921 in Title IV funds for students enrolled at ATI's Texas Campuses 10, 30 and 50.

## V.   ATI'S FRAUDULENT SCHEME

### A.   Background

69.   ATI is a privately owned, for-profit college that provides vocational training in a variety of career fields, including, but not limited to, the career fields of "medical assisting," "dental assisting," "massage therapy," "respiratory therapy," "welding," "automotive service,"

"air conditioning, heating and refrigeration," and "business administration." ATI is licensed by the TWC to operate in Texas, and is accredited by the Accrediting Commission of Career Schools and Colleges (ACCSC).

70.     ATI operates sixteen campuses in Texas, Florida, Oklahoma, and New Mexico, each of which offer a particular subset of ATI's vocational programs to students.  During the relevant time period, ATI had a corporate office and team located in Richland Hills, Texas that was responsible for the overall management of ATI and its various campuses.  The corporate team wass responsible for setting overall corporate goals and strategies, and overseeing the operations at each of ATI's campuses.  ATI's campuses were managed at the individual level by an executive director, as well as directors of admissions, career services, and financial aid, among others.  Each campus also had a number of other employees who focus on running the operations of the specific campuses, including Admissions Representatives and Career Services employees.

71.     ATI management employed a corporate strategy focused on increased admissions and profits above all else.  ATI's main priority was increasing its enrollment numbers and, hence, its revenues.  In furtherance of that strategy, ATI employed an army of Admissions Representatives and put intense pressure on them to enroll as many students as possible.  Admissions Representatives went to great lengths to recruit bodies.  They would recruit new students at prisons, parole meetings, homeless shelters, and the Salvation Army. They would induce students to enroll at ATI with promises of gift cards, bus passes, fuel cards, and, in some cases, even housing.  ATI Admissions Representatives were told to make their sales goals no matter what.  If they did not meet ATI's aggressive goals, they were told they would be terminated.

72.     To meet those sales goals, Admissions Representatives would enroll students regardless of whether those students were qualified for enrollment or whether ATI was the right fit for them.  As discussed below, they would fabricate proofs of education to enroll unqualified students.  They also engaged in a policy ATI called "flipping," whereby Admissions Representatives would attempt to convince students not to enroll in the program they were interested in, but instead to enroll in another program that ATI was attempting to fill at that time.  Their main focus was on filling seats, not on finding the right educational opportunity for each prospective student.  In some cases, as explained below, Admissions Representatives would enroll students in programs even though they knew the student would not be able to find employment after graduation due to, for example, a criminal record.  Once enrolled, students would be pressured to attend classes for at least the first five days, at which point ATI drew down Title IV funds on their behalf.

73.     ATI Admissions Representatives would lure students to ATI with promises of first-rate technical training and job placement upon graduation.  But when they arrived, the reality was far different.  To generate as much revenue as possible, ATI would often oversell classes, resulting in overcrowding.  Equipment was out of date and the quality of instruction was often poor.  Many of its facilities were also poorly-maintained and outdated.  For example, for months the air-conditioning in Campus 10 was not functioning, despite the fact that air-conditioning repair was a program offered at that campus.  There were also safety concerns at several of ATI's campuses, to the extent of requiring police coverage during school hours.  Students at ATI were also sometimes violent towards each other, instructors, and staff, which prevented an educational environment conducive to learning.

74.     ATI students found that their employment prospects after graduation from ATI were not as promised.  Despite spending thousands of dollars for training in a new career field, many found that they were not any better off after graduating from ATI than they were prior to enrollment, and some students in this position incurred substantial debt.  ATI's Career Services Department was often unhelpful and/or unsuccessful in placing students in their fields of study after graduation.  Students were thus unable to find quality jobs and often returned to jobs similar to those they held prior to enrolling at ATI.  To keep up the appearance of a successful school, however, ATI would falsify placement statistics and then continue to lie to students about the opportunities available to them with an ATI diploma.

75.     ATI's focus on putting profits ahead of students' needs and quality of education resulted in ATI engaging in a variety of fraudulent practices designed to extract as much federal funding as possible from the Department of Education and from students.  ATI's conduct, as explained below, violated the Federal False Claims Act and resulted in payment by mistake and in ATI being unjustly enriched.

**B.     ATI Misled the TWC and the Department of Education by Falsifying Placement Statistics**

76.     ATI engaged in a widespread scheme to mislead the TWC and the Department of Education by falsely representing the number of graduates of its school who were placed in jobs in their field of study after graduation.

77.     The TWC requires that proprietary schools in Texas place at least 60 percent of their graduates in jobs in their field of study in order to be eligible for licensure.  To ensure it met that requirement, ATI knowingly fabricated the placement statistics it reported to the TWC for, at a minimum, Campuses 10, 30 and 50, and for at least the years 2007 through 2010.  It then certified, falsely, that the information it was providing to TWC on the placement of its graduates

was correct.  ATI engaged in this fraudulent scheme in order to maintain its license to operate in

Texas and, hence, its ability to draw down federal financial aid.

      78.    ATI was required to report its placement statistics for each of its programs at

Campuses 10, 30, and 50 on an annual basis.  In accordance with that requirement, ATI

submitted its purportedly accurate placement figures for Campuses 10, 30 and 50 to the TWC in

its annual reports and certified them as being accurate.  For example:

      a.  Executive Director Anthony Devore certified on November 25, 2008 that the

          Campus 10 placement report for September 1, 2007 through August 31, 2008 was

          "True and Correct;"

      b.  Executive Director Darrell Testerman certified on November 21, 2008 that the

          Campus 30 placement report for September 1, 2007 through August 31, 2008 was

          "True and Correct;" and

      c.  Executive Director A. Paulette Gallerson certified on November 25, 2008 that the

          Campus 50 placement report for September 1, 2007 through August 31, 2008 was

          "True and Correct."

      79.    The placement statistics that ATI submitted to the TWC for at least Campuses 10,

30 and 50 during the time period 2007 through 2010 did not accurately reflect ATI's placement

rates.  ATI artificially inflated the placement rates to make it appear as if it had placed

substantially more graduates at jobs in their fields of study than it actually did.  ATI

accomplished this artificial inflation through a variety of methods.

      80.    One method that ATI Career Services employees used to inflate ATI's placement

numbers was to create fake business cards for ATI graduates they could not place.  Career

Services employees would create the business cards online and place them in the students' files.

The students would then be recorded as self-employed on ATI's reports to the TWC.  For example, a former Career Services Coordinator at ATI's Campus 50 was aware of several students in the Massage Therapy program who had business cards created for them before they had taken or passed the licensure exam.  When the Career Services Coordinator raised this concern to the then Director of Career Services for Campuses 10 and 50, Renaldo Williams, she was told that this was part of the program and that the business cards could be placed in the students' Career Placement files and the students counted as "placed."

81.     Other members of management at ATI were aware of the business card scam. Several ATI employees involved in creating the fake business cards were taught how to do so by Renaldo Williams or ATI's Regional Director of Career Placement, Charlyn Heggins.  Another former Career Services employee complained to Campus 10 Executive Director Anthony Devore and then to ATI's Vice-President of Operations, Gary Dagampat, about the practice of creating fake business cards.  When he received no response, he emailed ATI's Director of Human Resources, Steve Lovig, regarding the illegitimate placements in April/May 2008 and then sent a similar email to the ATI Ethics Hotline in June or July of 2008.

82.     The following are examples of students that had fake business cards created so they could be listed as self employed:

     a.  automotive students: DB, JC, CC, JC, JC, SC, RE, CF, RF, AG, LG, KH, MJ, JJ, WJ, DK, RL, IM, RM, FM, MM, JR, JR;

     b.  HVAC students: AC, MD, TE, KJ, HK, AR, JR, CS, JW, JZ; and

     c.  welding students: JC, NF, SG, CG, JG, CM, AM, JP, JW.

83.     Another scheme used by ATI to artificially inflate the placement figures it reported to the TWC was to improperly claim students as placed in their fields if they could find

any tangential relationship between the student's job and his or her field of study.  Several students who graduated in business administration and worked as cashiers were improperly counted as placed in their field of study because they worked with money.  For example, one ATI employee counted as "placed" a business administration graduate who worked at Dollar General.  This employee claims he was directed to do so by Jeff Myers, ATI's Regional Director of Career Placement.  Another student with a welding diploma, NF, was counted as placed in his field while working as a manager at a Braum's Ice Cream Shop because he once repaired a machine in the shop by welding parts.

84.     ATI also employed graduates for a day or so past graduation at ATI, as ATI lab technicians, or in similar settings, and then improperly counted them as placed in their fields.  For example, graduates CC (reported as in inventory control), LG (reported as a laboratory assistant), BJ (reported as a laboratory assistant), and TT (reported as a laboratory technician) were employed for a day past graduation at ATI.  Graduates LL (reported as a laboratory technician) and LR (listed as a maintenance technician) were also employed for a day past graduation as janitors at ATI.  At least one ATI Career Services employee complained about this practice to ATI management, including Anthony Devore, Steve Lovig, and Gary Dagampat, and also to the ATI Ethics Hotline.

85.     Another method used by ATI career services employees to inflate ATI's placement rates was to create false companies and then fraudulently claim that students had found employment there.  For example, six graduates of ATI's Heating and Air Conditioning (HVAC) programs were identified as having found employment at a fake company whose address was a residence.

86.     ATI also fraudulently claimed to have placed students at existing companies.  For example, ATI identified several students as being placed at Durahauler, Inc., a utility trailer manufacturer in Mesquite, Texas.  A Durahauler employee agreed to falsely state that ATI graduates were employed there when he received confirmation calls.

87.     An analysis of ATI's claimed placements from Campus 10 in the September 2007 to August 2008 time period illustrates the methods ATI was employing to artificially inflate its placement rates.  Of the 523 total students on the report, 78 students, or 14.9 percent, were either working for a company that bore the students' own names, were self-employed, or were placed at ATI.  That percentage increases to 19.8 percent if only the students ATI claimed were employed in their field of study are included in the analysis.

88.     Audits by the TWC confirmed that the placement rates ATI was reporting were not accurate.  In 2011, the TWC hired an independent accountant to audit ATI's placement figures for the time period 2009 through 2010.  The findings of the third party accountant's review include, among other things:

      a.  61 of ATI's 63 programs had placement rates over-reported by 2% or more percentage points;

      b.  60 programs had placement rates over-reported by 5% or more percentage points;

      c.  57 programs had rates reported that were higher than the upper limit of the 95% confidence interval of the accountant's reported recomputed employment rate; and

      d.  of ATI's 60 programs, 40 programs dropped from having met TWC's required 60% employment rate.

89.     ATI's fabrication of placement statistics resulted in ATI receiving federal financial assistance that it otherwise would not have been entitled to receive.  By falsifying its placement rates, ATI was able to ensure that it met the TWC's licensure requirement that ATI maintain a sixty percent placement rate.  State licensure, in turn, is a requirement to be eligible for federal funding under Title IV of the HEA.  ATI's PPAs explicitly state that ATI is required to maintain its state license in order to be eligible for federal funding..  Indeed, when the TWC became aware that ATI had fabricated placement statistics, it notified ATI on July 27, 2011, that it would be immediately revoking its certificates of approval for all schools owned by ATI. Although TWC ultimately rescinded its universal revocation of ATI's certificates of approval after reaching a settlement agreement with ATI, TWC did permanently revoke the licenses for 22 of ATI's programs.  ATI also voluntarily closed several programs (which remain closed today) after discussions with the TWC in response to the revelation of the fabricated placement figures. ATI's falsification of placement statistics was thus material to the TWC's decision-making process regarding licensing and resulted in ATI drawing down federal funding which it otherwise would not have been eligible to receive but for its fraudulent conduct.

**C.     ATI Made Material Misrepresentations to Induce Prospective Students to Enroll at ATI**

90.     Federal law and Texas regulations forbid proprietary schools such as ATI from making misrepresentations to students to induce them to enroll at ATI.  Among other things, ATI is forbidden from making misrepresentations to prospective students about their employability after graduation.  The making of substantial misrepresentations is grounds for revocation or termination of an educational institution's PPA.

91.     In each PPA it executed for Campuses 10, 30 and 50, ATI represented that it would comply with federal regulations governing the award of Title IV funding, including the

requirement that it not make false statements or misrepresentations to prospective students regarding employability upon graduation. ATI also certified when it drew down federal grant funds that it was expending the funds in accordance with the PPAs. ATI's agreement to comply with Title IV regulations and its execution of its PPAs was a requirement for ATI to be eligible to receive Title IV funding. ATI's statements were false when made and material to the Department of Education's decision to allow ATI to participate in Title IV funding programs.

92.    ATI Admissions Representatives at Campuses 10, 30 and 50 made a variety of substantial misrepresentations to induce students to enroll at ATI. As stated above, ATI regularly inflated its official placement statistics reports through a variety of means. ATI Admissions Representatives then publicized these artificially inflated and highly inaccurate placement statistics to prospective students to induce them to enroll at ATI. One former ATI Admissions Representative and Assistant Director of Admissions, who worked at Campuses 10, 30 and 50, admits that Admissions Representatives often reported inflated placement statistics up to 85 percent to prospective students. She recalls ATI's Chief Operating Officer (COO), Carli Strength, reciting those incorrect placement figures during an annual ATI managers' conference.

93.    ATI Admissions Representatives also consistently misinformed prospective students as to their potential career earnings. They would often quote expected salaries to prospective students that had no basis in reality. For example, at Campus 30, prospective dental assistant students were told that they could expect to earn $22 per hour, but in reality the Admissions Representatives knew they would more likely earn between $15 and $16 per hour. One Admission Representative at Campus 30 stated that she received the bogus numbers she quoted to prospective students directly from Campus 30's Director of Admissions, Ray Torres.

She also claims Torres sat in on prospective interviews and witnessed Admissions Representatives quote fabricated numbers to prospective students but did nothing.

94.    At Campus 10, Admissions Representatives falsely told welding students they could make as much as $100,000 per year by going overseas to work.  They also falsely told automotive technology students that they could make $18 to $19 per hour and electronics students that they could make $15 to $16 per hour  Admissions Representatives knew that the salaries they were quoting were higher than the legitimate salary ranges provided by the TWC.

95.    At Campus 50, Admissions Representatives would falsely tell students in respiratory therapy that they could earn between $60,000 and $70,000 per year upon graduation, when the Bureau of Labor Statistics reports the median pay for respiratory therapists in 2010 as $54,280.  The Director of Admissions at Campus 50 was aware of the false figures being quoted to students.

96.    A former Career Services Coordinator at Campus 50 and Director of Career Services at Campus 10 heard Admissions Representatives providing false and inaccurate information to prospective students during the enrollment process.  Admissions Representatives would tell students considering entering medical assisting that they could make $32,000 a year upon graduation, although the expected wage was actually $8-12 per hour.  Similarly, prospective pharmacy technician students would be quoted future earnings of $40,000 - $50,000 a year, when the Bureau of Labor Statistics reports the median pay for pharmacy technicians in 2010 as $28,400.  Business administration students were told they could make hundreds of thousands of dollars per year when that figure had no basis in fact.

97.    ATI Admissions Representatives also misled students with criminal records about their prospects for employment after graduation from ATI.  Many of the students who attended

ATI had prior criminal records.  Indeed, one former Admissions Representative and Assistant Director of Admissions at Campus 10 estimated that 20-40 percent of the students at Campus 10 had been through the criminal justice system.  Because of their criminal histories, many of those students would have difficulties finding employment in their fields of study after graduation. Admissions Representatives nevertheless recruited these students for programs they knew required clean background checks without disclosing the difficulties they would have finding jobs after graduation.

98.     For example, one former Admissions Representative and Director of Admissions who worked at Campuses 10, 30 and 50 stated that she and other Admissions Representatives would enroll students with criminal backgrounds into the respiratory therapy program even though they knew these students would not be able to be licensed upon graduation due to their criminal histories.  She indicated that these students would attend classes for years only to find out at their externships that they were not eligible for placement because of their criminal backgrounds.

99.     ATI representatives actively recruited individuals with criminal records despite their placement problems.  Admissions Representative Natasha Walker would create flyers and distribute them at jails and the Salvation Army in an attempt to recruit students.  ATI Admissions Representatives also recruited from meeting of parolees.  For example, Admissions Representatives from Campus 10 visited parolees on Tuesday mornings from July to October 2008 to discuss opportunities at ATI.  Campus 10 also held a recruiting day for parolees in March 2008 to enroll them into the HVAC program.  It was one of the highest enrollment weeks on record at the time.  ATI Admissions Representatives told students with criminal histories at

this recruiting day that their criminal histories would not matter despite knowing that fields such as massage therapy and HVAC required clean background checks.

100.     One former Career Services Coordinator at Campus 50 and Director of Career Services at Campus 10 states that she overheard many Admissions Representatives telling prospective students that their criminal histories would not be a problem.  She also states that she had been reprimanded by her supervisor, Cecil Reynolds, for telling students that they could have a problem getting a job after graduation because of their criminal histories.  Reynolds told her to stop warning students of the potential problems their criminal backgrounds posed because she was ruining sales.   That same day, Campus 10 Executive Director Anthony Devore also told her to stop telling students that their criminal backgrounds might cause problems.

101.     ATI also made false statements to prospective students about their loan indebtedness.  For example, Anthony Devore, Executive Director of Campus 10, suggested that the re-entry coordinator at his campus send "second chance" postcards to former students who had dropped out of ATI.  The re-entry coordinator complied and sent the postcards, which stated that if the student returned to ATI, the educational debt the former student had already incurred would be forgiven:

> "Life does not always give us second chances.
> Here is your chance to **re-enroll in your program** and have the **debt** you
> **incurred** to date **forgiven** when you graduate!
>
> Too good to be true?  It is true and we want to help you make a fresh start.
> Give us a call to discuss how you can get back in school and complete your career
> training in the program of your choice.
>
> Too often our students forget why they started school in the first place.  Take a
> minute to remember your situation – perhaps a dead-end job, little pay, or feeling
> like a failure as a parent.  Many of our students feel the same way you did, and
> they have found that graduating helped them in immeasurable ways.  Do you
> remember the goals that you set for yourself?  Are you on track to achieve those
> goals?

**Hurry!!  This forgiveness program ends soon."**

102.    ATI, however, had no intention of paying off the student's existing debt.  The

only debt that would be forgiven, if any, was the accrued interest on any outstanding cash

balance owed directly to ATI.

103.    Consistent with ATI's corporate culture of admitting students at all costs, ATI

Admissions Representatives and Career Services employees, with the knowledge and approval of

ATI management, made a number of substantial misrepresentations to prospective students to

induce those students to enroll at ATI, as described above.  The students to whom the statements

were made could reasonably be expected to rely on ATI's false statements.  ATI's false

advertising violated federal law, Texas regulations, and its PPAs and resulted in ATI receiving

federal funds to which it would not otherwise have been entitled to receive but for its fraud.

**D.    ATI Caused the Department of Education to Award Financial Aid to
Ineligible Students and Fabricated Documents to Conceal Their Ineligibility**

104.    In order receive funding under Title IV of the HEA, federal law requires that a

prospective student at ATI have a valid high school diploma or its recognized equivalent, or,

during the relevant time period, be able to pass an ATB test.  Federal law also states that only a

student maintaining satisfactory academic progress in his or her course of study according to the

school's published standards, and in accordance with federal guidelines, is eligible for financial

assistance under Title IV of the HEA.  By signing its PPAs, ATI agreed it would comply with

these regulations.

105.    ATI engaged in various fraudulent schemes in order to ensure that the Department

of Education awarded Title IV funding to students who were not qualified to receive such federal

funds.  ATI engaged in these schemes so that it could increase its enrollment numbers and

receive federal financial aid on behalf of those students, regardless of whether the students were actually benefitting from ATI's instruction.  ATI then fabricated documents to cover up its fraudulent practices.  ATI's conduct caused the Department of Education to award federal funding to students who would not otherwise have been eligible to receive such funding.

106.    ATI regularly engaged in falsifying high school diplomas in order to award Title IV funds in violation of federal regulations.  For example, ATI fabricated a number of Dallas Independent School District (DISD) diplomas, including the following:

a.   MG, who was enrolled in ATI's Combination Welding program from June 4, 2008 to April 1, 2009, had a fake DISD diploma is his student file.  He later defaulted on his student loans.

b.   GJ, who was enrolled in ATI's HVAC program from November 24, 2008 to May 19, 2009, had a fake DISD diploma is his student file.  He later defaulted on his student loans.

c.   PO, who was enrolled in ATI's Electronic Systems Technician program from April 29, 2008 to December 22, 2008, had a fake DISD diploma is his student file.  He later defaulted on his student loans.

d.   CS, who was enrolled in ATI's HVAC program from November 24, 2008 to June 17, 2009, had a fake DISD diploma is his student file.  He later defaulted on his student loans.

e.   AW, who was enrolled in ATI's Electronic Systems Technician program from July 16, 2008 to March 27, 2009, had a fake DISD diploma is his student file.  He later defaulted on his student loans.

107.    A former Admissions Manager at Campus 10 is aware of 72 students who had their proofs of education fabricated at ATI.  Those students were enrolled at Campus 10 and ATI drew down federal funding on their behalf.

108.    Several Admissions Representatives, including Marcina Stewart at Campus 50 and Reynaldo Knight at Campus 10, participated in fabricating diplomas.  Anthony Devore, Executive Director at Campus 10, was aware that Reynaldo Knight was fabricating diplomas.

109.    ATI also engaged in the fraudulent practice of purchasing high school diplomas from Bluebonnet Private High School and arranging for prospective students to do so.  In exchange for a fee, Bluebonnet Private High School provided diplomas that purported to be sanctioned by the State of Texas, when, in fact, they were not.  In June 2011, the State of Texas obtained an injunction against Bluebonnet Private High School as a result of these practices.  Bluebonnet Private High School provided these invalid diplomas to ATI students at Campuses 10, 30, and 50.

110.    ATI also engaged in fraudulent conduct in connection with the administration of its ATB test, in order to award Title IV funds to unqualified students without a valid high school diploma.  It allowed students who failed an ATB test, and did not have any alternative eligibility qualifications, to receive Title IV funds, in violation of federal regulations.

111.    For example, one former Resource Manager at Campus 50 tutored many students who failed the ATB test but were nevertheless allowed to enroll at ATI and receive Title IV funds.  She estimated that during a 60-day period she had 150 students take the ABT test, yet only 60 students passed the test.  Of the 90 students who failed, she estimated that 60-70 of them were allowed to attend classes and receive Title IV funds.

112.    At Campus 50, surrogate test takers were allowed to take the ATB exam for others.  One Admissions Representative, Paul Holt, had allowed a wife to take the ATB exam for her husband.  Another Admissions Representative at Campus 10, Reynaldo Knight, had paid a group of surrogate test takers to take the ATB test for others.

113.    ATI also assisted Daniel Dao, an ATB proctor who had been decertified by Wonderlic, Inc., the test publisher of ATI's ATB test, in becoming certified under another name and allowed him to proctor ATB tests for prospective students.  Wonderlic had determined in 2009 that there were certain anomalies in Daniel Dao's testing results, which indicated that the tests had not been properly administered.  Wonderlic thus decertified him in July 2009. Subsequently, in August 2009, Daniel Dao sought certification under the "assumed" name of Daniel Nguyen, using friends' addresses on his new application for certification.  Dao sought certification under a false name with the knowledge of the campus Director of Admissions, Erica Pouncie.  Dao's falsified application was faxed to Wonderlic by ATI.

114.    ATI engaged in various fraudulent conduct in order to ensure that students not benefitting from instruction at ATI maintained their enrollment and, hence, their eligibility for federal financial aid.  Pursuant to ATI's attendance policy, students who missed 10 consecutive days or more than 20 percent of their classes were required to be dropped.  ATI, however, would change student attendance records to avoid dropping students and losing federal aid.  For example, at the direction of Campus 10 Executive Director Anthony Devore, the registrar at Campus 10 routinely changed student attendance records in the campus' computer system in order to make it appear as though students had attended a sufficient percentage of classes to avoid dropping them.

115.    According to at least one ATI Career Services employee, if a student was approaching the 20 percent absence mark, ATI would attempt to get the student to come in for "makeup" time. ATI would then falsify time sheets to make it appear as if the student "made up" more time than he or she actually did. For example, students would sit in makeup time for about ten minutes and then sign forms indicating that they had made up an hour of class time. ATI would also give students makeup credit for time spent in their actual assigned classes, thus giving them credit for two classes when they actually only attended one. This Career Services employee stated that ATI's Regional Director of Education, Gene Jones, was well aware of the acts taken by Career Services employees to break the 10 day cycle and/or avoid the 20 percent rule. Gary Dagampat, ATI's Executive Vice President of Operations, and Carli Strength, ATI's President and COO, were also made aware of these actions.

116.    According to the registrar at Campus 10, ATI's Regional Director of Education, Kathy Fox, directed her to meet with students nearing the 20 percent absence mark to discuss makeup time. Students would stay in makeup time for ten minutes and then sign forms saying they made up an hour of class time, and the meetings with students to discuss making up time would also be counted as classroom makeup time.

117.    One student at Campus 10, DL, who did not have a valid high school diploma or its recognized equivalent, and had not passed an ATB test, had missed over 20 percent of his classes as of September 1, 2008. He should have had all Title IV money returned to the Department of Education because he did not have a valid high school diploma or its equivalent. Director of Education Anthony Goss, Director of Admissions Erica Pouncie, Director of Financial Aid Jane Lam, and Executive Director Dwight Berry were all informed of this by e-

mail on September 8, 2009.  However, DL did receive and retain federal financial aid, and he has since defaulted on his student loans.

118.    Also pursuant to ATI's attendance policy, students were required to attend classes for at least the first five days in order for ATI to draw down federal financial student aid for that student for that semester.  There were students, however, who would enroll at ATI, yet not attend classes.  In order to avoid losing federal aid for those students, ATI would falsify attendance reports to make it appear as though those students who enrolled but did not attend classes had actually done so.  A former ATI Admissions Representative at Campus 10, Reynaldo Knight, also paid surrogates to sit in classes for students in order to satisfy ATI's requirement that students attend classes for at least five days to be eligible for financial aid.  Campus 10 Executive Director, Anthony Devore, and ATI's Executive Vice President of Operations, Gary Dagampat, were made aware of Knight's conduct.

119.    An instructor, Jackie Johnson, submitted an ethics complaint internally in April 2008 stating: "I currently have students up to 20 days absent consecutive and have had students added to my roster after the class has been in session for over three weeks…"  He also stated that other instructors had the same problems and that his class roster did not match the school's reports.

120.    ATI engaged in other fraudulent conduct in order to ensure that students maintained their enrollment at ATI (and, hence their eligibility for federal aid), regardless of whether the students were eligible or benefitting from ATI's instruction.  Directors and other staff held "scrub meetings" and pressured instructors to falsify attendance sheets in order to meet enrollment and retention numbers as well as generally prevent students from dropping out of ATI.  Directors and other staff altered or falsified grade reports in order to prevent students from

being dropped from classes. Even when drops finally occurred, those drops took place weeks or months after a drop was appropriate. At Campus 10, Anthony Devore ordered the registrar to add a customer service course to transcripts whether or not the student had taken it in order to meet graduation requirements for the automotive program.

121.    ATI's Education Department would also delay graduation dates for some students so that they could extend the window of time for which ATI could collect financial aid for them. The ATI Registrar at Campus 10 would change student graduation dates to make it appear as if it had taken the student much longer to graduate than it actually did. In the meantime, ATI would draw down additional financial aid for those students. For example, one massage therapy student at Campus 50, AB, was carried over for a year.

122.    ATI's financial aid employees also engaged in a variety of fraudulent practices that resulted in students receiving more federal aid than they were entitled to receive. For example, ATI employees, as directed by ATI management, including campus Executive Directors:

a.    coached financial aid applicants to list themselves as "independent" rather than "dependent" regarding income tax status;

b.    counseled students to falsely list relatives' children as applicants' dependents in order to increase applicants' eligibility for financial aid;

c.    improperly retained applicants' FAFSA PIN numbers so that ATI employees could edit and alter FAFSA applications; and

d.    encouraged fraudulent FAFSA submissions omitting applicants' spouses' tax returns in order to increase the amount of available federal student aid available for applicants.

123.    Management at ATI condoned and encouraged this fraudulent conduct.  For example, a Manager of Admissions at Campus 10 became aware that an Admissions Representative, Reynaldo Knight, had, among other things, coached a student on how to appear to be an independent student for financial aid purposes (even though he should have been listed as a dependent student), and confronted Knight about his conduct.  This Manager was subsequently reprimanded for chastising Knight by ATI's Vice President, Victor Benavides.  The same Admissions Manager discussed his concerns with financial aid improprieties with other ATI management, including Campus 10 Financial Aid Director Jane Lam and Executive Director Anthony Devore.  He was subsequently placed on a Performance Improvement Plan and then resigned.

124.    Through its conduct above, ATI caused students to submit applications for federal financial aid that contained false statements, including false statements regarding the student's eligibility for federal aid and/or the student's financial situation.  Those false statements were material to the Department of Education's decision to award federal aid to those students.  ATI also falsely certified, in its PPAs and each time it drew down federal grant monies, that it was complying with federal regulations governing the eligibility and award of Title IV funding under the HEA.  ATI's false statements and fraudulent conduct resulted in ATI receiving federal aid that it would not otherwise have been entitled to receive but for its fraud.

**E.    ATI Knowingly Made False Statements and Falsified Files in Order to Cover Up Its Fraudulent Scheme**

125.    ATI knowingly made, or caused to be made, the false statements and claims outlined above.  ATI's fraudulent conduct permeated the Admissions and Career Services departments in at least three campuses.  The fraudulent conduct by ATI Admissions Representatives and other employees was also encouraged and/or directed by management at

ATI. The repeated mantra amongst campus Executive Directors and other ATI management personnel was to do what had to be done to get students enrolled and packaged. The management level employees who were aware of and/or encouraged the fraud include, but are not limited to, the Executive Directors at Campuses 10, 30 and 50; ATI's Executive Vice President of Operations, Gary Dagampat; ATI's National Director of Career Services, Renaldo Williams; ATI's Regional Director of Education, Kathy Fox; ATI's Regional Director of Career Placements, Charlyn Heggins; ATI's Vice President of Recruitment, Victor Benavides; and ATI's COO and later CEO, Carli Strength.

126.    ATI certified when it signed its PPAs in 2008 and each time it drew down federal grants monies that it would comply with the federal regulations governing the award of Title IV funding, including the requirements that it would maintain its accreditation and state licensure, not make substantial misrepresentations, and award Title IV funds only to eligible students. Those statements were false when made. Indeed, ATI had been engaged in a widespread scheme since at least 2007 to defraud the TWC and Department of Education in order to secure as much federal aid as possible.

127.    ATI also falsified records and concealed information from state regulators in order to ensure that its fraudulent scheme would continue undetected. ATI moved and hid documents in advance of audits by the TWC and the ACCSC. For example, in November 2009, in advance of an ACCSC accreditation audit, the Director of Education, Anthony Goss, and the Executive Director, Dwight Berry, at Campus 10, moved boxes of admissions and financial aid files out of the building and into another ATI employee's truck, and told that employee not to bring them back until the audit was over. That employee then proceeded to move some files

home and hid other files elsewhere inside the school. They also hid and moved files in advance of TWC audits in the Spring of 2010.

128.    The concealment of material information was encouraged by upper level management at ATI. For example, during an audit in April 2008, Corporate Regional Education Director Kathy Fox emailed CEO Carli Strength and Vice President Carolyn Gallagher saying "They let us select which drop files to give them!" Carolyn Gallagher replied "Perfect! Keep the good news coming...."

129.    In an ATI document listing lessons learned after accreditation renewal, one of the lessons learned listed is "Put the problem files on the bottom."

130.    In the Spring of 2008, on Campus 50, a box of student files went missing. Because a TWC audit was approaching, ATI employees forged signatures on enrollment contracts in order to recreate the lost files at the direction of Kishori Patel, who supervised ATB Advisors.

131.    ATI also altered job titles or temporarily removed employees in advance of TWC and ACCSC audits. For example, David Dagampat, Executive Director at Campus 50, did not have a college degree, and so he was removed from the campus prior to an ACCSC audit and reinstated once the audit was completed.

132.    ATI engaged in the conduct in paragraphs 75 through 131 above in order to conceal its fraud from state regulators and the Department of Education, to maintain its accreditation, and to ensure its continued access to Title IV funding.

## VI. THE SUBMISSION OF FALSE CLAIMS

133.    Every request for a federal grant or federally guaranteed loan made on behalf of a student at ATI's Campuses 10, 30 or 50 constitutes a separate false claim. The following

examples of student financial aid packages, each of which included a false secondary education credential in the student's file, illustrate ATI's false claims:

    a.   ATI student MG received a financial aid package consisting of $1,437 in Pell Grant funds, $3,500 in Stafford Subsidized loan funds, and $4,000 in Stafford Unsubsidized loan funds for the 2007-2008 financial aid award year. MG additionally received a financial aid package of $4,731 in Pell Grant funds, $1,500 in Stafford Subsidized loan funds, and $1,333 in Stafford Unsubsidized loan funds for the 2008-2009 financial aid award year. MG defaulted on his loan obligations on December 14, 2010.

    b.   ATI student GJ received a financial aid package consisting of $2,216 in Pell Grant funds, $2,334 in Stafford Subsidized loan funds, and $4,000 in Stafford Unsubsidized loan funds for the 2008-2009 financial aid award year. GJ defaulted on his loan obligations on February 11, 2011.

    c.   ATI student PO received a financial aid package consisting of $1,437 in Pell Grant funds for the 2007-2008 financial aid award year. PO additionally received a financial aid package of $3,154 in Pell Grant funds for the 2008-2009 financial aid award year. PO received $3,500 in Stafford Subsidized loan funds, and $4,000 in Stafford Unsubsidized loan funds for the 2007-2008 and 2008-2009 financial aid award years. PO defaulted on his loan obligations on July 23, 2010.

    d.   ATI student CS received a financial aid package consisting of $4,731 in Pell Grant funds, $3,500 in Stafford Subsidized loan funds, and $6,000 in Stafford Unsubsidized loan funds for the 2008-2009 financial aid award year. CS defaulted on his loan obligations on February 17, 2011.

e.   ATI student AW received a financial aid package consisting of $4,731 in Pell Grant

funds, $3,500 in Stafford Subsidized loan funds, and $6,000 in Stafford Unsubsidized

loan funds for the 2008-2009 financial aid award year.  AW defaulted on his loan

obligations on November 24, 2010.

f.   ATI student DL received a financial aid package consisting of $2,334 in Stafford

Subsidized loan funds, and $689 in Stafford Unsubsidized loan funds for the 2008-

2009 financial aid award year.  DL defaulted on his loan obligations on January 2,

2011.

134.   Each of the grant awards listed and described above and each government

repayment of loan interest or defaulted loan principal was caused by ATI's fraudulent

maintenance of its state licensure, its false statements and promises in its PPAs that it would

comply with applicable laws and regulations governing the award of federal financial aid, and/or

the false representations in each grant and loan application that the student seeking federal

government aid was eligible to receive Title IV funding under the HEA.  ATI's conduct was

knowing and material to the Department of Education's willingness to award federal financial

aid to ATI's students.  Each request for payment thus constitutes a false claim under the False

Claims Act.

135.   The examples above are illustrative of the many false claims presented by, or

caused to be presented by, ATI for federal financial assistance under Title IV of the HEA.

## VII. CAUSES OF ACTION

### Count I: False or Fraudulent Claims
(31 U.S.C. § 3729(a)(1)(A) (2009), formerly 31 U.S.C. § 3729(a)(1)(2006))

136.   Paragraphs 1 through 135 are re-alleged as though fully set forth herein.

137.    ATI knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2009), formerly 31 U.S.C. § 3729(a)(1)(2006), specifically, the claims for student loan and Pell Grant payments under the Title IV student financial assistance programs.

138.    Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count II:  False Statements
(31 U.S.C. § 3729(a)(1)(B) (2009), formerly 31 U.S.C. § 3729(a)(2)(2006))

139.    Paragraphs 1 through 135 are re-alleged as though fully set forth herein.

140.    ATI knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, and/or to get the United States to pay or approve false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009), formerly 31 U.S.C. § 3729(a)(2)(2006).

141.    Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count III: Unjust Enrichment

142.    Paragraphs 1 through 135 are re-alleged as though fully stated herein.

143.    By reason of the foregoing conduct and violation of federal law, Defendant was unjustly enriched and is liable to account for and pay such amounts, which are to be determined at trial, to the United States.

### Count IV: Payment by Mistake

144.     Paragraphs 1 through 135 are re-alleged as though fully stated herein.

145.     By reason of the foregoing conduct of the Defendant, the United States made payments under mistake of fact.

146.     As a result of these payments made by the United States under mistake of fact, the United States has sustained damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, the United States, demands judgment against Defendant as follows:

Under Counts I and II (False Claims Act), for an amount of the United States' damages, trebled as required by law, plus such civil penalties as are required by law, together with all such further relief as may be just and proper;

Under Count III (Unjust Enrichment), for an accounting and the amount by which Defendant was unjustly enriched, plus interest and costs, and expenses, and all such further relief as may be just and proper;

Under Count IV (Payment by Mistake), for an accounting and the amount the United States paid to the Defendant, plus interest and costs, and expenses, and all such further relief as may be just and proper;

Such other relief as this Court may deem just and proper, together with interest and costs of this action.

**THE UNITED STATES DEMANDS A JURY TRIAL AS TO ALL ISSUES SO TRIABLE.**

Respectfully submitted,


STUART F. DELERY
Acting Assistant Attorney General

SARAH R. SALDAÑA
United States Attorney


Michael D. Granston
Renée Brooker
Melissa R. Handrigan
D.C. Bar No. 471019
Clare Wuerker
Virginia State Bar No. 79236
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261, Ben Franklin Station
Washington, DC 20044
Telephone:  202.305.3083
Facsimile: 202.307.5788
Email: melissa.r.handrigan@usdoj.gov
Email: clare.wuerker@usdoj.gov

Colin D. Speaker
Assistant United States Attorney
Texas State Bar No. 24060642
Burnett Plaza, Suite 1700
801 Cherry Street, Unit 4
Fort Worth, Texas 76102-6882
Telephone: 817.252.5286
Facsimile:  817.252.5458
Email: colin.speaker@usdoj.gov

Attorneys for Plaintiff United States of America